## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

Albert L. Fisher, M.D.,                    )
                                           )
        Plaintiff,              )
                                           )
    vs.                         )     Case No. 1:13-cv-00152-WCG
                                           )     Honorable William C. Griesbach
                                           )
Aurora Health Care, Inc.,                  )
                                           )
        Defendant.              )
                                           )

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

## Table of Contents

Introduction ........................................................................................................... 1

Legal Standard ...................................................................................................... 2

Background ............................................................................................................ 3

Argument ............................................................................................................... 4

I.      Plaintiff Fails to State a Claim for Relief Under Antitrust Law. ........................ 4

        A.      Dr. Fisher Does Not Have Antitrust Standing and Cannot Plead Antitrust
                Injury Necessary to Pursue Either of His Sherman Act Claims. ........................ 4

                1.      Fisher Has Not Alleged, and Cannot Allege, That He Has Suffered
                        an Antitrust Injury. ........................................................................... 5

                2.      Dr. Fisher's Antitrust Claims Also Fail Because He Is Not a Proper
                        Antitrust Plaintiff. .......................................................................... 8

        B.      Plaintiff's Conclusory Allegations of a Conspiracy Are Not Sufficient to
                State a Claim for Relief Under Section 1 .......................................... 10

        C.      Dr. Fisher Cannot Succeed on His Section 2 Essential Facility Claim. .............. 12

                1.      Dr. Fisher's Allegations Demonstrate That Aurora's Oshkosh
                        Hospital is Not an Essential Facility. ................................................. 13

                2.      The Essential Facility Doctrine Does Not Apply to Hospital
                        Decisions as to Medical Staff or Physician Access. ............................. 15

II.     Dr. Fisher's Claims Under State Law Should Likewise Be Dismissed. ......................... 16

        A.      Dr. Fisher Executed a Release That Bars Each of His Claims. ........................ 18

        B.      The Hospital Bylaws Governing the Parties' Relationship Demonstrates
                That No Breach of Contract Occurred. .................................................. 19

        C.      Dr. Fisher Fails to Plead a Tortious Interference Claim. ......................... 22

        D.      Dr. Fisher's Quantum Meruit Claim Fails as a Matter of Law. ...................... 25

        E.      Even if Not Dismissed on Their Merits, the State-Law Claims Should be
                Dismissed in the Absence of Federal Jurisdiction. ................................. 26

Conclusion ......................................................................................................... 26

i

## Introduction

Plaintiff, Dr. Albert Fisher, either would not or could not satisfy his obligation to provide continuous care for his patients who were admitted to Aurora Medical Center in Oshkosh ("AMCO"). As a result, Dr. Fisher was not permitted to renew his staff privileges with AMCO. Dr. Fisher now sues AMCO's parent, Aurora Health Care, Inc. ("Aurora"), under a hodgepodge of legal theories, including alleged antitrust violations and various state common law claims. None has any merit.

It is almost universally recognized that antitrust claims brought by a physician based on his or her exclusion from practicing at a single hospital must fail as a matter of law. As the Court of Appeals for the Seventh Circuit has observed,

> [t]he cases involving staffing at a single hospital are legion. Hundreds, perhaps thousands of pages in West publications are devoted to the issues those circumstances present. . . . Those hundreds or thousands of pages almost always come to the same conclusion: the staffing decision at a single hospital was not a violation of section 1 of the Sherman Act.

*BCB Anesthesia Care, Ltd. v. Passavant Mem. Area Hosp. Ass'n*, 36 F.3d 664, 667 (7th Cir. 1994). The same conclusion is compelled here. In addition, Dr. Fisher's Section 2 claim fails because he has pled himself out of a claim by alleging that Aurora has less than a monopoly share of the relevant market and because AMCO is not an "essential facility."

Dr. Fisher also asserts three tag-along state law claims – breach of contract, tortious interference, and quantum meruit. All of these claims are barred by the release and waiver Dr. Fisher signed in connection with his staff application and should be dismissed on the merits. Dr. Fisher has also failed to adequately allege facts to support each of these state law claims. Alternatively, with the dismissal of the federal antitrust claims, there will be no supplemental jurisdiction over these claims and they should be dismissed on that basis alone.

1

## Legal Standard

Dismissal is proper where a complaint fails to state claims upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For a claim to be plausible, a plaintiff must plead factual allegations that allow the Court to draw the reasonable inference that the defendant is liable for the alleged conduct. *Id.* Thus, allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a mere "speculative level." *Twombly*, 550 U.S. at 555. While detailed factual allegations are not required under this framework, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. Moreover, a plaintiff's conclusory allegations are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680.

In the antitrust context, bare allegations of a conspiracy are not sufficient to state an antitrust claim; rather, there must be enough facts pled which, taken as true, plausibly suggest the existence of an actual anti-competitive agreement. *Twombly*, 550 U.S. at 556. Allegations of parallel conduct and a mere assertion of conspiracy "without some further factual enhancement...stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 557 (internal quotation marks and quoting citation omitted). In complex antitrust litigation, "a fuller set of factual allegations...may be necessary" to survive a motion to dismiss. *See Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008). If discovery is likely to be costly – as is almost inevitable in antitrust cases – "the complaint must include as much factual detail and argument as may be required to show that the plaintiff has a plausible claim." *Id*. at 803-04; *see also Twombly*, 550 U.S. at 558.

2

## Background

For purposes of this Motion to Dismiss only, the facts (but not merely conclusory statements) as alleged in the Complaint are accepted as true, except to the extent they conflict with Dr. Fisher's written contract. A brief summary of the allegations of the Complaint is helpful to evaluating this Motion to Dismiss.

Plaintiff Albert L. Fisher ("Dr. Fisher") is a Wisconsin-licensed family-practice physician, who has practiced in Oshkosh, Wisconsin since 1985. (Compl. ¶¶ 3, 8.) Defendant Aurora Health Care, Inc. ("Aurora") owns and operates a hospital in Oshkosh called Aurora Medical Center – Oshkosh ("AMCO"). (*See id*. ¶ 9.) AMCO controls roughly 40 percent of the share of the "hospital-based family practice medical services" market in the metropolitan Oshkosh area. (*Id*. ¶¶ 37, 39.)

Dr. Fisher was granted staff privileges at AMCO around 2005. (*Id*. ¶ 10.) For obvious reasons of patient care, Aurora and AMCO require a physician on staff at AMCO to provide continuous coverage for that physician's admitted patients, either by being personally available or by designating a qualified alternate physician who has staff privileges at AMCO to cover. (*Id*. ¶ 15.) Dr. Fisher disagreed with and refused to comply with those continuous coverage responsibilities. (*See id*. ¶ 23; *see also id*. ¶¶ 21, 24.) In 2012, according to Dr. Fisher, Aurora decided not to renew Dr. Fisher's staff privileges because of Dr. Fisher's refusal to comply with the continuous coverage obligations. (*See id*. ¶¶ 23-24.)[1]

---

[1] While Dr. Fisher alleges that Aurora refused to consider his application, the decision to reject Dr. Fisher's application was actually a hospital medical staff decision.

3

## Argument

### I. Plaintiff Fails to State a Claim for Relief Under Antitrust Law.

Dr. Fisher asserts antitrust claims under both Section 1 and Section 2 of the Sherman Act. For his Section 1 claim, Dr. Fisher alleges that Aurora "acted in concert to restrain trade" through its policies on physicians providing continuous coverage for their patients. (*See* Compl. ¶ 46.) Dr. Fisher's Section 2 claim rests on the allegation that Aurora controls an "essential facility" and has effectively prevented Dr. Fisher from accessing it. (*See* Compl. ¶¶ 70, 73.) Both of these claims fail because Dr. Fisher lacks the requisite antitrust standing and antitrust injury. Hospital staffing decisions have, for obvious public policy reasons, been given deference and do not subject a hospital to antitrust liability. Moreover, Dr. Fisher's conclusory allegations of a purported conspiracy are insufficient to state a claim for relief under Section 1. And Dr. Fisher has pled himself out of court with respect to his Section 2 claim not only by acknowledging the existence of a viable alternative hospital to which he can admit his patients and at which he can (and, Aurora believes, does) practice medicine, but also by acknowledging that Aurora does not have a monopoly to support a Section 2 claim.

#### A. Dr. Fisher Does Not Have Antitrust Standing and Cannot Plead Antitrust Injury Necessary to Pursue Either of His Sherman Act Claims.

Both of Fisher's antitrust claims should be dismissed for lack of standing under Section 4 of the Clayton Act. The doctrine of antitrust standing limits the pool of potential antitrust plaintiffs "in order to assure efficient use of the resources of the courts" in achieving the purpose of antitrust laws. *Kochert v. Greater Lafayette Health Servs.*, 463 F.3d 710, 715-16 (7th Cir. 2006). For a plaintiff to bring an antitrust claim, he must first show that he suffered an antitrust injury, which is a harm of the sort meant to be prevented by antitrust law, and then he must show that he "can most efficiently vindicate the purposes of the antitrust laws." *Id*. at 716

4

(quoting *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 598 (7th Cir. 1995)).   All of Dr. Fisher's antitrust claims should be dismissed because he can neither plead an antitrust injury nor demonstrate that he has antitrust standing as the plaintiff best positioned to bring these antitrust claims.

### 1.     Fisher Has Not Alleged, and Cannot Allege, That He Has Suffered an Antitrust Injury.

For either of his antitrust claims to survive a motion to dismiss, Dr. Fisher must allege injury from anticompetitive conduct – an antitrust injury.  *See generally BCB Anesthesia*, 36 F.3d 664.  Generally, an antitrust injury is one that the antitrust laws were intended to prevent, *i.e.*, an injury to competition.  *Kochert*, 463 F.3d at 716.  It is well settled that simple pecuniary injury to an individual competitor does not constitute an antitrust injury because the antitrust laws exist to protect competition, not competitors.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).  A complaint does not allege an antitrust injury "[w]ithout any allegation as to how market-wide competition will be affected."  *Wagner v. Magellan Health Serv.*, 121 F. Supp. 2d 673, 682 (N.D. Ill. 2000) (quoting *Elecs. Comm. Corp. v. Toshiba*, 129 F.3d 240, 245 (2d Cir. 1997)).

A staffing decision at a single hospital, like the staffing decision presented by Dr. Fisher's claims, does not constitute an antitrust injury as a matter of law.  *BCB Anesthesia*, 36 F.3d at 669.  In *BCB Anesthesia*, the Seventh Circuit rejected an antitrust claim by plaintiff nurse anesthetists based on the defendant hospital's decision to terminate its exclusive contract with them.  *Id*.  In rejecting the plaintiffs' claim, the court recognized that "there is nothing obviously anticompetitive about a hospital choosing one staffing pattern over another or in restricting the staffing to some rather than many, or all."  *Id*. at 667.  Accordingly, "[a] staffing decision does not itself constitute an antitrust injury."  *Id*. at 669.  "If the law were otherwise, many a

5

physician's workplace grievance with a hospital would be elevated to the status of an antitrust action." *Id.*; *see also Vakharia v. Little Co. of Mary Hosp. & Health Care Ctrs.*, 917 F. Supp. 1282, 1300-01 (N.D. Ill. 1996) (dismissing plaintiff anesthesiologist's antitrust claims for hospital's refusal to grant staff privileges because "problematic staffing decisions at a single hospital" do not give rise to a claim under either Section 1 or 2 of the Sherman Act).

That is precisely the case here, where Dr. Fisher fails to adequately allege any injury to competition, and where his claim is simply a workplace grievance arising from a staffing decision. That staffing decision does not, and cannot, provide a basis for a claim of an antitrust injury. Aurora has the "unquestioned right to exercise some control over the identity and number to whom it accords staff privileges" without being subjected to antitrust claims by disgruntled physicians to whom the hospital medical staff decided not to extend staffing privileges. *BCB Anesthesia*, 36 F.3d at 667.

An antitrust injury is a loss that results from actions that either increase prices to consumers or reduce output. *Wagner*, 121 F. Supp. 2d at 681; *Philips Getschow Co. v. Green Bay Brown Cty. Prof. Football Stadium Dist.*, 270 F. Supp. 2d 1043, 1047 (E.D. Wis. 2003). Nowhere in the Complaint does Dr. Fisher allege that Aurora's conduct had the effect of raising prices for consumers. And case law conclusively demonstrates that Dr. Fisher's vague allegations of reduced output cannot succeed as a matter of law. In the health care context, patients' inability to select any one doctor is not an injury to competition because, if patients can see "another qualified physician, there has only been a reduction in suppliers, not in the output of patient care." *Wagner*, 121 F. Supp. 2d at 681; *see also Med. Consultants, Ltd. v. Iroquois Mem'l Hosp.*, No. 07-2083, 2008 U.S. Dist. LEXIS 112878, *11-12 (C.D. Ill. May 27, 2008), adopted by No. 07-cv-2083, 2008 U.S. Dist. LEXIS 46483 (C.D. Ill. June 16, 2008); *Levine v.*

6

*Cent. Fla. Med. Affiliates*, 72 F.3d 1538, 1554 (11th Cir. 1996) (finding that patient unable to see her specific doctor at a specific hospital is not a detriment to competition).

For example, in *Medical Consultants*, the district court dismissed claims brought by a group of radiologists who alleged that they had been excluded from a hospital's staff. *Med. Consultants*, 2008 U.S. Dist. LEXIS 112878, at *2. The court found that there was no antitrust injury without allegations of increased prices or unavailability of services because "in the context of an antitrust injury, the issue is whether radiology services are available, not whether a particular radiologist provides them." *Id.* at *12 (citing *Wagner*, 121 F. Supp. 2d at 682).

Here, the only market effect claimed by Dr. Fisher resulting from Aurora's alleged conduct is Dr. Fisher's patients' inability to be seen <u>by Dr. Fisher</u> at AMCO. *Wagner* and other courts have held that allegations such as these are not enough to constitute an antitrust injury as a matter of law. *See*, *e.g.*, *Wagner*, 121 F. Supp. 2d at 681-82 (holding that inability of certain patients to be seen by one particular doctor at one particular hospital was insufficient to show antitrust injury).

Dr. Fisher's antitrust allegations thus fail because he does not plead any facts that suggest that prices have risen, that services have become unavailable, or any other cognizable antitrust injury. Instead, he alleges merely that "[t]he exclusion . . . of Plaintiff from roughly 40% of the relevant market is harmful to consumers" (Compl. ¶ 45), that "Defendant's action has reduced the availability of independent physicians in the relevant market" (*id*. ¶ 51), that "[b]y excluding Plaintiff . . . Defendant's boycott reduced competition" (*id*. ¶ 56), and that the "exclusion of Plaintiff has . . . reduced the overall output of family practice physicians" (*id*. ¶ 62). As an initial matter, these sorts of conclusory allegations that consumers and competition were harmed are precisely the type of threadbare claims without supporting facts that *Twombly*

7

instructs are insufficient. *See Twombly*, 550 U.S. at 556-67; *see also Phillips Getschow*, 270 F. Supp. 2d at 1048 (holding that conclusory allegations of anti-competitive effects are not enough to state claim for antitrust injury). However, even ignoring the pleading deficiencies, Dr. Fisher is fatally unable to allege antitrust injury because he cannot allege that patients have been unable to see a family-practice physician (possibly a detrimental reduction in output); he can only possibly allege that <u>his</u> patients cannot be seen <u>by him</u> at <u>AMCO</u>, which is only a slight reduction in the availability of a particular physician at a single hospital. That is not an antitrust injury. *See Wagner*, 121 F. Supp. 2d at 682, n.5 ("Choice of physician should not be a factor . . . . The issue is whether the services were available, not who provided them."). Because a staffing decision at a single hospital regarding a single doctor (without more) does not constitute an antitrust injury as a matter of law, Dr. Fisher's antitrust claims do not and cannot plausibly suggest that he is entitled to relief. They should be dismissed on this basis alone.

 **2. Dr. Fisher's Antitrust Claims Also Fail Because He Is Not a Proper Antitrust Plaintiff.**

Antitrust standing requires not only a showing of antitrust injury, but also a showing that the plaintiff is the most efficient enforcer of the antitrust claim. *Kochert*, 463 F.3d at 716. That is not Dr. Fisher. The Supreme Court has identified six factors to consider when determining if a litigant is the party "who can most efficiently vindicate the purposes of the antitrust laws." *Id*. at 718 (quoting *Serfecz*, 67 F.3d at 598). Those factors are:

> (1) [t]he causal connection between the alleged anti-trust violation and the harm to the plaintiff; (2) [i]mproper motive; (3) [w]hether the injury was of a type that Congress sought to redress with the antitrust laws; (4) [t]he directness between the injury and the market restraint; (5) [t]he speculative nature of the damages; (6) [t]he risk of duplicate recoveries or complex damages apportionment.

8

*Id.* (quoting *Sanner v. Bd. of Trade*, 62 F.3d 918, 927 (7th Cir. 1995)). In *Kochert*, the Seventh

Circuit found that an anesthesiologist who alleged he was driven from the market did not have

standing because he was not the best plaintiff in an antitrust action. *Id.* Emphasizing the fourth

factor (the directness between the injury and the market restraint), the court found that if prices

or services had indeed suffered, patients or their insurers would be preferable vindicators of

those injuries. *Id.* at 718-19. In the context of an antitrust claim for medical services, it is the

consumers of the services who are best positioned to defend their rights. Other courts have

similarly held that excluded physicians are not the appropriate plaintiffs to enforce potential

antitrust violations under circumstances like those alleged here. *See, e.g., Korshin v. Benedictine*

*Hosp.*, 34 F. Supp. 2d 133, 140 (N.D.N.Y. 1999) (stating that "[n]umerous courts have held that

a physician is not the most appropriate person to enforce potential antitrust violations" in

circumstance where physician was denied continued privileges at hospital); *Davies v. Genesis*

*Med. Ctr.*, 994 F. Supp. 1078, 1096 (S.D. Iowa 1998) (stating that "[o]ther courts have

determined that physicians challenging termination of staff privileges at a hospital are not

appropriate plaintiffs to enforce antitrust laws"). The upshot of these cases is that, because

antitrust laws are meant to protect competition and not individual competitors, "consumers of

[medical] services, including patients, referring physicians, … third-party payers, and the

government would be more 'efficient enforcers' of the antitrust laws because they have stronger

interests in ensuring that prices, services, quantity and quality remain at competitive levels."

*Korshin*, 34 F. Supp. 2d at 140.

      Dr. Fisher's Complaint makes clear that his motivation in asserting his antitrust

claims is the advancement of his own pecuniary interests and not an interest in ensuring that

prices, services, quantity, and quality remain at competitive levels. (*See* Compl. ¶¶ 58, 61

(alleging that Dr. Fisher lost revenue, market share, and patient volume).)  These alleged injuries are only tangentially related, at best, to any alleged injury to consumers.  *Kochert* and other cases hold that it is injury to the patients (the consumers) that represent the potential harm the antitrust laws are meant to prevent.  If consumers are indeed harmed by the refusal to renew a single doctor's privileges at a single hospital (and they are not), then consumers should properly vindicate the injury.  *See Kochert*, 463 F.3d at 719 (stating that if defendant's conduct was truly anticompetitive and served to raise prices and reduce quality, surely those effects would not go unnoticed by patients or insurers).[2]  Dr. Fisher lacks standing as a proper antitrust plaintiff, and his claims should be dismissed on this basis as well.

### B.   Plaintiff's Conclusory Allegations of a Conspiracy Are Not Sufficient to State a Claim for Relief Under Section 1.

Even if the Court were to conclude that Dr. Fisher had adequately alleged facts to show antitrust injury and standing, his Section 1 claim would nevertheless fail because he has not adequately alleged the necessary elements of an antitrust conspiracy.  To demonstrate a violation of Section 1 of the Sherman Act, a Plaintiff must prove three elements:  (1) that a contract, combination or conspiracy exists between two or more entities that (2) unreasonably restrains trade and (3) affects interstate commerce.  *See, e.g., Marrese v. Interqual, Inc.*, 748 F.2d 373, 379 (7th Cir. 1984).  *Twombly* holds that, to state a claim for relief under Section 1, a complaint must contain enough facts, taken as true, to suggest that an illegal agreement was made.

---

[2] Dr. Fisher alleges that the "exclusion of Plaintiff from the relevant market has reduced the quality and quantity of services available for patients . . . ."  (Compl. ¶ 62.)  This conclusory allegation does not provide sufficient factual support – or logical support – for this conclusion. In any event, it still does not provide Dr. Fisher – as a non-consumer – standing to pursue his antitrust claims.

*Twombly*, 550 U.S. at 556. "[L]awful parallel conduct fails to bespeak unlawful agreement," and mere allegations of parallel conduct and conspiracy are not enough. *Id.*

In contrast to what *Twombly* requires, all Dr. Fisher alleges is that, "in furtherance of their agreement and understanding with Aurora," physicians at Theda Clark Medical Center refused to provide call coverage for independent physicians like Dr. Fisher, and that Aurora "acted in concert" with and "induced" Theda Clark doctors to refuse to provide call coverage, all taken with a "common design and understanding." (Compl. ¶¶ 17, 43, 47, 49.) But there are no facts alleged to support these assertions, which are merely a regurgitation of common phrases from antitrust jurisprudence. *See Twombly*, 550 U.S at 555 (holding that a formulaic recitation of claim elements is insufficient). Dr. Fisher merely alleges that two entities have acted in the same manner, and then he takes a tremendous leap to assert the existence of a conspiracy to restrain trade.

These allegations of parallel conduct by Theda Clark and Aurora physicians with a bare assertion of conspiracy are not enough; "without some further factual enhancement [allegations like these] stop[] short of the line between possibility and plausibility of entitle[ment] to relief." *Twombly*, 550 U.S. at 557 (internal quotation marks and quoting citation omitted). Dr. Fisher's Complaint contains nothing more than a "formulaic recitation of the elements" of his Section 1 cause of action. *Id.* at 555. Stating that Theda Clark physicians and Aurora "acted in concert" and "in furtherance of their agreement and understanding" is plainly insufficient under *Twombly.* (Compl. ¶ 17, 43, 46); *see also Tamburo v. Dworkin*, 601 F.3d 693, 699-700 (7th Cir. 2010) (affirming dismissal of antitrust claims and deeming conclusory allegations of monopoly power, anticompetitive conduct, and Section 1 violation – without factual allegations suggesting conspiracy or antitrust injury – to be "plainly improper under

Case 1:13-cv-00152-WCG   Filed 03/29/13   Page 13 of 29   Document 9

*Twombly*.").  Parallel conduct must be "placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *Twombly*, 550 U.S. at 556-67.  Dr. Fisher cannot meet this burden by the paltry allegations he advances. Nor does Dr. Fisher offer any fact-based allegation whatsoever – just the bare conclusion that Aurora and physicians at Theda Clark conspired – that would suggest that he could meet this burden if this claim proceeded further.  *See id.* at 556.  Dr. Fisher's Section 1 claim should therefore be dismissed.

> **C.  Dr. Fisher Cannot Succeed on His Section 2 Essential Facility Claim.**

Dr. Fisher also alleges an "essential facility" doctrine violation by Aurora.  (*See* Compl. ¶¶ 68-80.)  The essential facility doctrine is disfavored by the courts.  *See Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 410-11 (2004) (criticizing the essential facility doctrine "crafted by some lower courts" and noting that the Supreme Court "[h]ad never recognized such a doctrine").  In order to arguably establish an essential facility claim, a plaintiff must demonstrate:  "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility."  *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1132-33 (7th Cir. 1983).

Dr. Fisher's essential facility claim fails on its merits for two reasons, in addition to Dr. Fisher's inability to plead antitrust injury and standing as addressed above.  First, Dr. Fisher's allegations in his Complaint and the realities of the market at issue conclusively demonstrate that AMCO is not an essential facility.  Second, the doctrine does not apply to staffing decisions regarding the composition of a hospital's medical staff or physician access to a hospital.

12

1. **Dr. Fisher's Allegations Demonstrate That Aurora's Oshkosh Hospital is Not an Essential Facility.**

Dr. Fisher's Complaint, and the geographic and commercial realities in Oshkosh, Wisconsin, make it impossible for Dr. Fisher to satisfy the first element of an essential facility claim – that a monopolist controls an essential facility. *MCI Commc'ns*, 708 F.2d at 1132-33. Critically, Dr. Fisher's own allegations demonstrate that AMCO is neither a monopolist nor an essential facility.

First, the only fact that Dr. Fisher alleges to suggest that Aurora has monopoly power is that Aurora controls a hospital in Oshkosh that has "roughly 40% of the market share." (Compl. ¶ 39.) But an allegation of less than half of the market share is inconsistent with monopoly power. In *Blue Cross & Blue Shield United v. Marshfield Clinic*, the plaintiff insurer and HMO alleged that Marshfield Clinic's own HMO had a monopoly on the HMO market in northern Wisconsin. *Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1409 (7th Cir. 1995). After first determining that HMOs did not constitute a separate healthcare market, the court stated that physician services in the area was a more reasonable market, a market in which Marshfield had no more than a 50 percent share. *Id*. at 1410-11. The court held that Marshfield did not have monopoly power in the market since "50 percent [market share] is below any accepted benchmark for inferring monopoly power from market share." *Id*. at 1411-12 (collecting cases).

Dr. Fisher, by pleading that AMCO has only 40 percent of the market share in the Oshkosh area, has effectively admitted that Aurora does not have monopoly power and is not, therefore, an essential facility. *Id*. at 1411. Further, the Court may properly take judicial notice

13

of the fact that there is another major hospital located in Oshkosh (Mercy Medical Center)[3], which is located only a few miles from AMCO (and it is not the Theda Clark hospital that is referred to in the Complaint).[4]  With the Complaint alleging that the relevant market in this case is "hospital-based family practice medical services" in the Oshkosh area (Compl. ¶¶ 37, 38), and further alleging that Aurora controls "roughly 40% of the market share" (*id.* ¶ 39), the presence of one other major hospital in the geographic market establishes that at least a majority of the other 60 percent of the market share for "hospital-based family practice medical services" must reside elsewhere.

Second, Dr. Fisher fails to plead that AMCO is an essential facility, for many of the same reasons that Dr. Fisher does not allege monopoly power.  The Seventh Circuit in *Blue Cross* explained that the seminal example of an essential facility was a train terminal in St. Louis that was run by fourteen of twenty-four railways.  *Id.* (citing *United States v. Terminal Railroad Ass'n*, 224 U.S. 383 (1912)).  Found to be the only way to cross the Mississippi River, the Supreme Court in *Terminal Railroad* required the terminal to allow the other railways access without discrimination.  *Id.*  The Seventh Circuit in *Blue Cross* found that, in order to be an essential facility, the facility must actually be essential – it must be the only way to access the market.  *Id.* at 1413.  That a competitor simply wishes to use the preferred facility is of no importance:  "The successful competitor, having been urged to compete, must not be turned upon

---

[3] Dr. Fisher's 2011 reappointment application for staff privileges at AMCO (*see infra* Part II; (Borgardt Decl., Ex. A, at 2)) disclosed that Dr. Fisher holds staff privileges at Mercy Medical Center in Oshkosh and at a few other hospitals in the Fox Valley area.

[4] This matter of judicial notice is appropriate for consideration on a motion to dismiss.  *In re Harley-Davidson Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 973 (7th Cir. 2009).  A court assessing antitrust claims on a motion to dismiss should not ignore commercial and geographic realities.  *Davies*, 994 F. Supp. at 1095, 1101 (considering surrounding cities and nearby hospitals within a geographic area in assessing a physician's antitrust claims on a motion to dismiss).

when he wins." *Id.* (quoting *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945)). Thus, for a facility to fit within the essential facility doctrine, the facility must be the only possible option. That is clearly not the case here.

By alleging that AMCO controls a 40 percent share of the relevant market of hospital-based family practice medical services, Dr. Fisher has foreclosed the possibility of establishing that AMCO has monopoly power or that AMCO is an essential facility. Without those elements, Dr. Fisher's Section 2 essential facility allegation fails as a matter of law. Dr. Fisher has pled himself out of court on this claim.

### 2. The Essential Facility Doctrine Does Not Apply to Hospital Decisions as to Medical Staff or Physician Access.

In *Blue Cross*, the Seventh Circuit held that Section 2 claims of the type asserted by Dr. Fisher cannot succeed. *Blue Cross*, 65 F.3d 1406. In that case, an insurance company and HMO asserted that Marshfield Clinic, through monopoly power, excluded HMOs other than Marshfield's own HMO from the market. *Id.* at 1408. After determining that the clinic neither had monopoly power nor was an essential facility, the court went on to explain that Marshfield's conduct, alleged by the plaintiffs to be anticompetitive, was not an antitrust violation in any event. *See id.* at 1413-14. Specifically, the court held that Marshfield's refusal to allow its physicians to cover call responsibilities of independent physicians and its restriction on independent physicians having staff privileges at its hospitals were actions that are "ambiguous from the standpoint of competition and efficiency." *Id.* at 1413.

This guidance from the Seventh Circuit is directly applicable to Dr. Fisher's claims. He asserts that the Aurora-employed doctors at AMCO refused to provide patient coverage when Dr. Fisher was not on call and that Aurora eventually refused to renew his application for staff privileges. (Compl. ¶¶ 15, 16, 23.) *Blue Cross* makes clear that these

15

alleged actions, even if true, are not antitrust violations. *Blue Cross*, 65 F.3d at 1413-14 (stating that alleged practices in that case were not Section 2 violations in absence of market power).

Courts elsewhere have consistently held that the essential facility doctrine does not apply to decisions regarding the composition of a hospital's medical staff or physician access to its facilities. *Willman v. Hartman Hosp. E.*, 836 F. Supp. 1522, 1532 (W.D. Mo. 1993), *aff'd Willman v. Hartman Hosp. E.*, 34 F.3d 605 (8th Cir. 1994) (holding that essential facility doctrine did not apply to hospital's termination of physician's staff privileges); *Pontius v. Children's Hosp.*, 552 F. Supp. 1352, 1370 (W.D. Pa. 1982) (holding that essential facility doctrine did not apply to non-renewal of privileges); *Robles v. Humana Hosp. Cartersville*, 785 F. Supp. 989, 996 (N.D. Ga. 1992) (finding essential facilities doctrine not applicable in cases involving hospital peer-review decisions to revoke or limit staff privileges). The doctrine is consistently rejected in the context of antitrust claims brought by individual physicians who are denied access to hospital facilities for various reasons, including termination or non-renewal of medical privileges, such as the claim asserted by Dr. Fisher here. In short, "the essential facilities doctrine is not applicable when a hospital facility is denied to a physician." *Willman*, 836 F. Supp. at 1532.

## II.     Dr. Fisher's Claims Under State Law Should Likewise Be Dismissed.

Dr. Fisher also brings state-law claims for breach of contract, tortious interference with prospective economic advantage, and quantum meruit. None of these causes of action adequately states claims for relief, and they should be dismissed on their merits.

Attached to the Declaration of Cheryl Borgardt, which is filed with this Motion and Memorandum, are (1) a redacted copy of Dr. Fisher's Reappointment Application for staff privileges at AMCO executed by Dr. Fisher in August 2011, (2) the AMCO Medical Staff

16

Bylaws ("Bylaws") in effect in 2011, and (3) the AMCO Medical Staff Policy Governing Medical Practices relating to Admission, Transfer and Discharge of Patients (the "Policy") in effect in 2011. Dr. Fisher's allegations permit the attached documents to be considered by the Court on this Motion to Dismiss. This Court has held that documents outside of the pleadings can be considered at the motion to dismiss stage when the documents "are referred to in the complaint and … are central to the plaintiff's claim." *United States ex rel. Roach Concrete, Inc. v. Veteran Pac., JV*, 787 F. Supp. 2d 851, 855 (E.D. Wis. 2011).

> The court may consider those kinds of documents without converting the motion to one seeking summary judgment. If the plaintiff fails to attach such documents to the complaint, the defendant may submit them in support of his Rule 12(b)(6) motion to dismiss. And where the authenticity of such a document is undisputed, "[t]he court is not bound to accept the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions as to the proper construction and meaning to be given the material."

*Id.* (citations and quoting citation omitted).

Considering the Complaint's focus on the contractual obligations under the coverage policies, and their centrality to Dr. Fisher's claims, the contractual documents (the Bylaws and the Policy) that create the policies should be considered on this Motion. *See id.* at 854-55. Throughout the Complaint, Dr. Fisher refers to the requirements for physicians to be available for patients or have designated alternates available. (*See*, *e.g.*, Compl. ¶¶ 13, 15, 41, 74, 85, 86, 98.) Indeed, all of the claims asserted by Dr. Fisher arise entirely from Dr. Fisher's disagreement with the patient coverage policies imposed on AMCO physicians. Dr. Fisher also alleges a breach of contract claim and relies on allegations of his performance under his contract (Compl. ¶ 84) and Aurora's alleged breach of its "contractual obligations" (Compl. ¶ 85). In addition, the Complaint refers explicitly to Dr. Fisher's reappointment application (Compl. ¶¶ 22-24), which contains his agreement to be bound to the Bylaws and Policies, and which is

17

likewise integral to all of Dr. Fisher's claims. Dr. Fisher made his contractual performance, AMCO's patient coverage policies, and his reappointment application central to his claims; Aurora should be permitted, based on this Court's reasoning in *Roach Concrete*, to attach the documents to its Motion that Dr. Fisher failed to attach to his Complaint. *Roach Concrete*, 787 F. Supp. 2d at 854-55.

**A.      Dr. Fisher Executed a Release That Bars Each of His Claims.**

As part of Dr. Fisher's 2011 signed application for reappointment to the medical staff of AMCO, Dr. Fisher granted Aurora and its affiliates a full release "from any and all liability . . . for their acts performed in good faith and without malice in connection with [Dr. Fisher's] application and its review."  (Borgardt Decl., Ex. A, at 11.)  This release bars all of Dr. Fisher's state-law claims.

A release is enforceable when it covers the activity at issue and is permissible as a matter of public policy. *See Atkins v. Swimwest Family Fitness Ctr.*, 2005 WI 4, ¶ 13, 277 Wis. 2d 303, 691 N.W.2d 334. *Atkins* recited two public policy grounds from an earlier Wisconsin Supreme Court case that are considered when assessing the enforceability of such releases – whether the release clearly informs the signer of what is being waived, and whether the release alerts the signer to the nature and significance of what is being signed. *Atkins*, 2005 WI 4, ¶ 15 (citing *Yauger v. Skiing Enters., Inc.*, 2006 Wis. 2d 76, 84, 557 N.W.2d 60 (1996)).  Here, the release that Dr. Fisher signed both covers the conduct at issue and is permissible as a matter of public policy.  It should be enforced to bar Dr. Fisher's claims.

The release signed by Dr. Fisher as part of his reappointment application was narrowly tailored to cover only the specific conduct at issue here, namely, the consideration by Aurora of Dr. Fisher's reappointment application. *See Atkins*, 2005 WI 4, ¶¶ 20-21 (stating that a release is more helpful if it sets forth in clear terms what is being released).  It released Aurora

18

and its affiliates only from liability relating to "acts performed in good faith and without malice in connection with [Dr. Fisher's] application and its review." (*See* Borgardt Decl., Ex. A, at 11.) It is not overly broad like the rejected provision in *Atkins*, which purported to release the defendant from any and all liability. *See Atkins*, 2005 WI 4, ¶ 18. And by its narrow language, the release clearly and unambiguously informed Dr. Fisher of exactly what he was releasing and the nature and importance of what he was releasing by signing his reappointment application. *See id.* ¶ 15 (citing *Yauger*, 206 Wis. 2d at 84).

Moreover, holding hospitals and hospital organizations harmless for their good-faith conduct in reviewing and acting upon a physician's application for staff privileges makes abundant sense from a public policy perspective. Both hospitals and their patients have obvious interests in the medical staffs of the hospitals being comprised of high-quality physicians who agree to abide by the hospital policies that help ensure the best possible care for patients. A decision about who is deemed appropriate for hospital staff privileges may be compromised if the aura of potential litigation is permitted to factor into the decision-making process. Thus, the narrow release in this case should be enforced to bar Dr. Fisher's state-law claims.

**B.    The Hospital Bylaws Governing the Parties' Relationship Demonstrates That No Breach of Contract Occurred.**

Dr. Fisher's application included a signed statement, whereby he agreed, under the heading "Compliance with Medical Staff Bylaws," that:

> For each AHC Affiliate at which I hold or seek privileges or employment, I have had an opportunity to review a copy of the Medical Staff bylaws and policies as are in force at the time of my application. I agree to be bound by and comply with such Medical Staff bylaws and policies as they may be amended, in all matters related to the medical staff appointment and membership, without regard to whether or not appointment to the medical staff and/or clinical privileges are granted.

(Borgardt Decl., Ex. A, at 11.) The Bylaws and one such Policy (Borgardt Decl., Exs. B, C) to which Dr. Fisher agreed to be bound in order for Aurora to consider his reappointment application demonstrate that Dr. Fisher's breach of contract claim cannot succeed.

Several provisions in the Bylaws and the Policy make clear what was required of physicians like Dr. Fisher who were seeking appointment to the staff of AMCO. AMCO's and Aurora's conduct in accordance with these provisions, to which Dr. Fisher expressly agreed to be bound, is precisely the conduct that Dr. Fisher alleges is a breach of contract:

- Paragraph 2.3.23 of the Bylaws provides that each applicant for staff privileges at AMCO "must have alternate coverage available as required by the Policies Governing Medical Practices and applicable Departmental policies." (Borgardt Decl., Ex. B.)

- Paragraph 2.8.4 of the Bylaws further provides that Dr. Fisher, as an applicant for renewed staff privileges at AMCO, agreed to "provide or arrange for continuous care to his/her patients at the professional level of quality and efficiency established by [AMCO]" and agreed to delegate in his absence the responsibility for care of his patients to a qualified physician with the appropriate privileges at AMCO. (Borgardt Decl., Ex. B.)

- Paragraph 2.8.10 of the Bylaws states that Dr. Fisher agreed to provide "on-call coverage for emergency care services within his/her clinical specialty, as required by the Medical Staff." (Borgardt Decl., Ex. B.)

- The Policy regarding "Admission, Transfer and Discharge of Patients" provides that Dr. Fisher was required to assure "timely, adequate professional care" for his patients at AMCO by either being himself available or

20

by designating a qualified alternate practitioner with whom prior arrangements have been made to attend to Dr. Fisher's patients when he would be unavailable.

(Borgardt Decl., Ex. C.)

These requirements as to patient coverage, to which Dr. Fisher agreed to be bound, demonstrate that Aurora cannot have breached its agreement with Dr. Fisher when it in fact merely acted in accordance with Dr. Fisher's obligations to AMCO. Dr. Fisher alleges that Aurora breached by "insisting that [Dr. Fisher] provide 24/7 call coverage" and by "refus[ing] to consider [Dr. Fisher's] renewal of medical staff privileges" if he did not agree to provide the required continuous patient coverage. (Compl. ¶¶ 85, 86.) But providing continuous call coverage for patients was precisely what Dr. Fisher agreed to do by signing his reappointment application, and the decision to not accept Dr. Fisher's reappointment application was an appropriate action to take for an applicant that refused to provide the patient coverage that was required of AMCO physicians.[5] There was no breach here, and Dr. Fisher's cause of action for breach of contract should be dismissed.

Dr. Fisher alleges that he entered into a "verbal contract" with Aurora in 2005 "as part of his joining its medical staff in Oshkosh." (Compl. ¶ 82; *see also* Compl. ¶ 10 (indicating Dr. Fisher joined staff in 2005).) He alleges that this "verbal contract" provided "that when he is not 'on call' to see patients immediately, his patients would be admitted by the physician who is 'on call' for unassigned patients." (Compl. ¶ 82.) But the "alleged oral contract is not enforceable following the signing of a written contract with different terms." *Remington v.*

---

[5] Thus, the contractual documents that Dr. Fisher refers to in his Complaint, but does not attach, refute his conclusory allegations of a breach of contract. *Cf. Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 991 (7th Cir. 1991) (actual documents trump inconsistent allegations in complaint).

Case 1:13-cv-00152-WCG   Filed 03/29/13   Page 23 of 29   Document 9

*Country Jam USA, Inc.*, 2005 WI App 126, 284 Wis. 2d 571, 699 N.W.2d 253 (unpublished

opinion); *see also Town Bank v. City Real Estate Dev.*, 2010 WI 134, ¶ 36, 330 Wis. 2d 340, 793

N.W.2d 476 (quoting citation omitted) (stating that "[w]hen the parties to a contract embody

their agreement in writing and intend the writing to be the final expression of their agreement,

the terms of the writing may not be varied or contradicted by evidence of any prior written or

oral agreement in the absence of fraud, duress, or mutual mistake."). Dr. Fisher's allegations of

a verbal contract from 2005 cannot serve as a basis for his breach of contract claim today that is

wholly based on the consequences of his refusal to do what he agreed to do in a written contract

in 2011 – namely, comply with the written Bylaws and the medical staff policies. (*See* Borgardt

Decl., Ex. A, at 11.)

> **C.     Dr. Fisher Fails to Plead a Tortious Interference Claim.**

An individual improperly interferes with another's prospective contractual

relation either by inducing or otherwise causing a third person not to enter into or continue a

prospective business relation, or by preventing the other from acquiring or continuing a

prospective relation. *Foseid v. State Bank*, 197 Wis. 2d 772, 788, 541 N.W.2d 203 (Ct. App.

1995). In either case, the interference is not actionable unless it is both intentional and improper.

*Id*. That is, "the defendant must act with a purpose to interfere with the [prospective] contract."

*Id*. If the actor lacks this purpose, the conduct is not actionable even if it has the unintended

effect of preventing the plaintiff from dealing with a third party. *Id*.

The Wisconsin Supreme Court in *Burbank Grease Servs., LLC v. Sokolowski* set

forth the elements of this cause of action: "(1) the plaintiff had a contract or prospective

contractual relationship with a third party; (2) the defendant interfered with the relationship; (3)

the interference was intentional; (4) a causal connection exists between the interference and the

damages; and (5) the defendant was not justified or privileged to interfere." *Burbank Grease*

*Servs., LLC v. Sokolowski*, 2006 WI 103, ¶ 44, 294 Wis. 2d 274, 717 N.W.2d 781 (quoting *Hoey Outdoor Adver., Inc. v. Ricci*, 2002 WI App 231, ¶ 27, 256 Wis. 2d 347, 653 N.W.2d 763). Dr. Fisher has the burden of pleading, and proving, each of these elements. *See id.* ¶ 44; *Sedlacek v. D. Mark Group, Inc.*, 2011 WI App 75, ¶ 18, 334 Wis. 2d 146, 799 N.W.2d 928 (unpublished opinion) (noting plaintiff's burden to prove each element). Dr. Fisher cannot meet this burden for three reasons.

First, Dr. Fisher's Complaint, without pleading actual facts, simply recites the elements of this cause of action. (Compl. ¶¶ 90-96.) Pleading buzz-words from case law regarding a particular cause of action does not state a claim for relief. *Twombly*, 550 U.S. at 555. Dr. Fisher provides no factual basis that would transform his claim from mere possibility to plausibility of entitlement to relief, as *Twombly* requires. *Id.* at 557. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim for relief. *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S at 555 (holding that a formulaic recitation of claim elements is insufficient). Yet that is all Dr. Fisher can muster for his tortious interference claim, and thus this claim must be dismissed.

Second, Dr. Fisher fails to allege that there was a sufficient expectation of a prospective business relationship. Dr. Fisher alleges that he "had a valid and reasonable expectancy of prospective contractual relationships to provide services to his patients <u>when they are hospitalized at Aurora</u>." (Compl. ¶ 90 (emphasis added).) There are no facts alleged that would support this allegation. Simply put, Dr. Fisher has no reasonable expectation that he can treat patients at AMCO without complying with the contractual terms set forth in the Bylaws and medical staff policies which he agreed to comply with in his application. In upholding a circuit court's dismissal of a tortious interference claim under Illinois's similar state law, the Seventh

23

Circuit held that merely wanting to perform specific work does not allege a reasonable expectation of that business relationship. *Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500, 503 (7th Cir. 1998). "To demonstrate a reasonable business expectancy, a plaintiff need not prove that a contractual relationship existed with a third party, but it must show 'more than a mere hope' of future business dealings." *MPC Containment Sys., Ltd. v. Moreland*, No. 05 C 6973, 2008 U.S. Dist. LEXIS 60546, *56 (N.D. Ill. July 23, 2008) (quoting citation omitted). "'[R]easonable expectation' requires more than the hope or opportunity of a future business relationship." *Bus. Sys. Eng'g, Inc. v. IBM Corp.*, 520 F. Supp. 2d 1012, 1022 (N.D. Ill. 2007). Dr. Fisher's "expectancy of prospective contractual relationships to provide services to his patients when they are hospitalized at Aurora" is nothing more than a mere hope to do business in the future. (Compl. ¶ 90.)[6]

In short, based on the allegations in the Complaint, the only reason that Dr. Fisher could possibly assert for having any expectation of being able to provide services to his patients while they were at AMCO is some contractual arrangement between Dr. Fisher and AMCO. There is nothing else in the Complaint that comes close to creating such an expectation. However, for the reasons discussed above in Part II.B with respect to his breach of contract claim, any such expectation by Dr. Fisher would be entirely unfounded since his contract (and his factual allegations) demonstrate that he had no such contractual right to practice at AMCO.

Finally, Dr. Fisher's Complaint fails to allege that interference with his contractual relationship was improper. There is only liability for tortious interference if the

---

[6] Notably, Dr. Fisher does not allege that Aurora acted to prevent him from having contractual relationships with his patients at all, but rather he alleges that Aurora "acted intentionally in order to prevent [Dr. Fisher] from having . . . contractual relationships with his patients <u>at Aurora</u>." (Compl. ¶ 93 (emphasis added).)

24

interference is improper and unjustified. *Foseid*, 197 Wis. 2d at 788; *see Landess v. Borden, Inc.*, 667 F.2d 628, 631 (7th Cir. 1981) ("Under Wisconsin law, an individual inducing a third party to terminate a contract is liable for tortious interference only if he uses improper means, i.e., physical force or fraudulent misrepresentation, to induce termination."). Courts have required plaintiffs to plead that interference is unjustified and improper. *See, e.g., Bonser v. Cazador, LLC*, No. 12-cv-4889, 2012 U.S. Dist. LEXIS 169156 (N.D. Ill. Nov. 28, 2012) (applying Illinois law to grant a motion to dismiss a tortious interference action); *see also Sedlacek*, 2011 WI App 75, ¶ 18 (discussing plaintiff's burden to prove each element).

In *Landess*, for example, the plaintiff hauled milk from farmers to Borden. *Landess*, 667 F.2d at 630. Borden notified farmers that it no longer was going to take shipments from Landess. *Id*. In finding that Borden's interference with Landess's contract was not improper under Wisconsin Law, the Seventh Circuit found, *inter alia*, that Borden's "freedom to deal with those with whom it chooses" outweighed Landess's expectancy of the contracts. *Id*. at 632. Here too, the enforcement of its contractual right to require doctors to provide on-call coverage does not render Aurora's conduct "improper." *See Cudd v. Crownhart*, 122 Wis. 2d 656, 662, 364 N.W.2d 158 (Ct. App. 1985) (with respect to tortious interference claim, "a party has a right to protect what he believes to be his legal interest" even if that interest does not actually exist.) For these reasons, Dr. Fisher's cause of action for tortious interference must fall.

**D.     Dr. Fisher's Quantum Meruit Claim Fails as a Matter of Law.**

Dr. Fisher cannot bring a claim for quantum meruit after acknowledging and pleading the existence of a controlling contract. "[U]nder Wisconsin law, claims for unjust enrichment and quantum meruit only apply where the services performed were not covered by the parties' contract, where the contract is invalid or where the contract is unenforceable." *Roach Concrete,* 787 F. Supp. 2d at 858-59. In *Roach Concrete*, a contractor sued Veteran Pacific for

25

unpaid concrete work on a veterans' center. *Id*. at 854. The contractor brought claims both for breach of contract and quantum meruit. *Id*. at 858. While noting that Rule 8 allows pleading in the alternative, this Court found that the plaintiff did not explicitly plead its quantum meruit claim in the alternative, and by incorporating the rest of the complaint's allegations (including allegations regarding breach of contract) into that claim, the plaintiff had pled himself out of court on that claim. *Id*. at 859.

Such is precisely the situation here. Dr. Fisher asserts an entire cause of action based on an alleged breach of contract with respect to patient coverage obligations, and pleads the existence of that contract in several paragraphs of the Complaint. (Compl. ¶¶ 2, 81-88.) Then, at the outset of his quantum meruit cause of action seeking compensation for his patient coverage, Dr. Fisher incorporates by reference "all statements and allegations contained in this Complaint." (Compl. ¶ 99.) By so doing, Dr. Fisher pleads himself out of court on his quantum meruit claim under this Court's decision in *Roach Concrete*.

### E. Even if Not Dismissed on Their Merits, the State-Law Claims Should be Dismissed in the Absence of Federal Jurisdiction.

Even if this Court determines that Dr. Fisher has adequately pled his state-law claims, because of the necessary dismissal of Dr. Fisher's antitrust claims, the Court should exercise its discretion to decline to exercise supplemental jurisdiction over the state-law claims once the federal-question claims have been dismissed. 28 U.S.C. § 1367(c)(3).

### Conclusion

Dr. Fisher has not "nudged [his] claims across the line from conceivable to plausible, [and his] complaint must be dismissed." *Twombly*, 550 U.S. at 570. Unable to plead antitrust injury or standing, and foreclosed by case law from the Seventh Circuit and across the country from claiming that a staffing decision at a single hospital is actionable under either

26

Section 1 or Section 2 or the essential facility doctrine, Dr. Fisher attempts, in vain, to state a claim for relief by merely regurgitating common phrases and required elements often stated in antitrust jurisprudence, with the hope that these threadbare recitations will materialize into an actionable claim. Dr. Fisher is "attempt[ing] to fit the square peg of [his] dispute with the [h]ospital into the round hole of federal antitrust law," *Vakharia*, 917 F. Supp. at 1300, but Dr. Fisher's grievance with Aurora simply does not create antitrust liability. Neither do his allegations generate actionable claims under his various state-law theories. For all of the reasons set forth in this Memorandum, Aurora respectfully requests that this Court dismiss Dr. Fisher's Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

Dated this 29th day of March, 2013.

Respectfully submitted,

/s/ David W. Simon
David W. Simon, WI Bar No. 1024009
Michael D. Leffel, WI Bar No. 1032238
Adam E. Crawford, WI Bar No. 1056803
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
Telephone: (414) 297-5519 (DWS)
Fax: (414) 297-4900
Email: dsimon@foley.com (DWS)

*Attorneys for Defendant Aurora Health Care, Inc.*