

**MPC CONTAINMENT SYSTEMS, LTD., and MPC CONTAINMENT SYSTEMS LLC, Plaintiffs, v. JOHN E. MORELAND, LAWRENCE MORELAND, and MORELAND INTERNATIONAL LTD., Defendants.**

No. 05 C 6973

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*2008 U.S. Dist. LEXIS 60546*

July 23, 2008, Decided
July 23, 2008, Filed

**PRIOR HISTORY:** *MPC Containment Sys. v. Moreland*, 2008 U.S. Dist. LEXIS 31640 (N.D. Ill., Apr. 17, 2008)

**COUNSEL:** [*1] For MPC Containment Systems, Ltd., Plaintiff: Charles A. Laff, LEAD ATTORNEY, Michael Best & Fredrich LLC, Chicago, IL; Benjamin Beiler, MPC Group LLC, Chicago, IL; Brian P Paul, Raymond Marion Krauze, Michael Best & Friedrich, Chicago, IL; Michael A. Stiegel, Steven E. Cyranoski, Michael Best & Friedrich LLP (Illinois), Chicago, IL.

For MPC Containment Systems, LLC, Plaintiff: Charles A. Laff, LEAD ATTORNEY, Michael Best & Fredrich LLC, Chicago, IL.

For John E. Moreland, Lawrence Moreland, Moreland International, Ltd., Defendants: Francis A. Citera, LEAD ATTORNEY, Greenberg Traurig, LLP., Chicago, IL; Jacob B. Pankowski, Greenberg Traurig, LLP., Washington, DC; Jodi Rosen Wine, LEAD ATTORNEY, Russell Joseph Genet, Nixon Peabody LLP, Chicago, IL.

**JUDGES:** MARVIN E. ASPEN, United States District Judge.

**OPINION BY:** MARVIN E. ASPEN

**OPINION**

**REDACTED MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Presently before us is John E. Moreland's ("John"), Lawrence Moreland's ("Lawrence"), and Moreland International, Ltd.'s ("MIL") (collectively the "Defendants") Motion for Summary Judgment. Defendants argue that all eight remaining counts of MPC Containment Systems, Ltd.'s and MPC Containment Systems LLC (collectively [*2] "MPC") Second Amended Complaint fail as a matter of law. For the reasons set forth below, we grant in part and deny in part their motion.

**SUMMARY OF FACTS**

This lawsuit involves two corporations, MPC, a Delaware corporation, and MIL, an Illinois corporation. (Def. Facts PP 1, 2). John began working for MPC in 1979 in a consultant capacity. (John Decl. P 5). [1] In 1985, John became an Executive Vice President of MPC. (Pl. Facts P 4). [2] John was also the founder and sole shareholder and CEO of MIL. (Def. Facts PP 2, 3).

Lawrence, John's son, also worked at MPC from 1984 to 1997, and afterwards as an independent contractor at various times, including from 2000 to 2005. (Pl. Facts P 10; Pl. Resp. Def. Facts P 23; Def. Facts P 23). In 1998, Lawrence began working at MIL as its sole employee until October 2005. (Pl. Facts PP 4, 9; Def. Facts P 23).

> 1  MPC denies that John started in a consultant capacity, but has not cited to any evidence that creates a genuine dispute. (Pl. Resp. Def. Facts P 17).
> 2  It is disputed how long Moreland was Executive Vice President at MPC. Edward Reicin ("Reicin"), the President of MPC, claims that John served in that position until October 1, 2005 (Reicin Decl. P 4),  [*3] but Defendants claim that John was Executive Vice President until 2003, and afterwards served only as a consultant until October 2005. (Def. Resp. Pl. Facts P 7; John Decl. P 12).

Among other things, both MPC and MIL manufacture fuel and water flexible storage tanks in sizes up to 200,000 gallons. (Pl. Facts P 2; Def. Facts P 7). [3] These tanks are large fabricated bags made from polyurethane and nylon industrial fabric and can be used to hold fuel for vehicles and airplanes in combat regions. (Pl. Facts P 3). This case stems from John's affiliation with both companies, which both supply these tanks to the U.S. Air Force.

> 3  MPC is also in the fuel tank liner business and has sold some liner materials to MIL, which sold them as part of its cathodic protection business. (Berman Dep. at 135-38). MIL also repaired silos, using some fabric purchased from MPC. (*Id.* at 138-39). In addition, MIL sold hoses to the Air Force on at least one occasion. (Def. Facts P 45).

In 2000, MPC decided to bid on a five-year Air Force contract for the manufacture of 20,000 ("20K") and 50,000 ("50K") gallon tanks. (*Id.* P 11). At this time, John had significant responsibility over all aspects of MPC's tank business,  [*4] including overseeing technical matters. In August 2000, while in the development phase, John hired James Ford ("Ford") as an independent contractor to perform a finite element analysis ("FEA") analysis using his proprietary program to develop the equilibrium shape of the tank and to determine the maximum fabric stress of the tank. (Ford Decl. P 3; Def. Facts Exs. CCC & EEE). In addition, in January 2001, MPC hired Thomas Adduci ("Adduci"). [4] MPC's final 20K tank design utilized rounded corners, which overcame some of the structural problems associated with square corners. (Reicin Decl. P 9). [5] MPC was awarded the contract on February 23, 2001. (Reicin Decl. P 2).

> 4  MPC claims that Adduci was hired to assist with designing MPC's tanks, but Defendant claims that Adduci was a mere CAD draftsman who modified the patterns provided to him by Ford at Ford's direction. (Adduci Decl. P 1; Ford Decl. P 10).
> 5  The parties dispute whether these rounded corners were Ford's idea or MPC's idea. (Def. Facts P 11, Pl. Resp. Def. Facts P 11).

On April 4, 2001, MPC asked Ford to perform additional tests on the 20K tanks, to sign a confidentiality agreement, and to assign all proprietary rights for his work  [*5] to MPC. (Pl. Facts P 15, Ex. 11; Ford Decl. P 5). Ford refused to sign this agreement, and Reicin told him that he could disregard it. (Def. Facts Ex. KK). [6] On May 12, 2001, John instructed Ford to "proceed with detailed pattern drawings for the complete tank assembly." (Pl. Facts P 19). Ford created these patterns, but the parties dispute his role in creating the sizes and shapes that would have to be cut out of the fabric. (Adduci Decl. P 6; Ford. Decl. P 7). In addition, the parties dispute whether Ford's pattern included other elements of the tank design, such as the seaming and seaming allowances, which MPC's claims were corrected by Adduci and John. (Pl. Facts P 21; Adduci Decl. P 7; John 30(b)(6) Dep. at 64; Def. Resp. Pl. Facts P 21).

> 6  Despite not signing the agreement, Reicin states that Ford "did not refuse to enter into a confidentiality agreement with MPC." (Reicin Decl. P 23). In addition, MPC claims that Ford had obligations of confidentiality as a licensed engineer. (Pl. Resp. Def. Facts P 14).

In 2002, MPC began designing a 200,000 gallon ("200K") [7] tank based on its 20K design. (Adduci Decl. P 8). In June 2002, Adduci, with John's guidance, created drawings and elevations  [*6] of MPC's 200K tank. (Pl. Facts P 24). The designs were based on "derivatives of what Mr. Ford did" for the 20K tank, and Ford is listed as the designer on the panel drawings. (Adduci Dep. at 17-18; Reicin Dep. at 160; Ford Decl. Ex. M). In December 2002, MPC asked Ford to review the fabric stress of this design, and in January 2003, he provided a

FEA model, indicating that the 200K corners were derived from the original 20K corners and that MPC should increase the size and number of panels. (Pl. Facts PP 25, 26, Ex. 22).

> 7   The parties both reference 200,000 gallon and 210,000 gallon tanks. For purposes of this opinion, we will refer to both of these sizes as "200K" tanks.

In February 2003, MPC filed a patent on its 50K tank design listing John, Ford, and Reicin as joint inventors. (*Id.* P 27 & Ex. 23). The patent application stated that "tanks of other capacities may be easily fashioned by employing the same end dimensions and adjusting the length of the respective panels." (Def. Facts Ex. I at MIL003040). Ford refused to sign the patent unless either he was listed as the sole inventor or the patent rights of each inventor were limited to that person's specific contribution. (Ford Decl. [*7] P 11). However, MPC then filed a modified patent application on November 20, 2003, which listed only Reicin and John as inventors. (Def. Facts Ex. I). This patent issued on May 8, 2007. (*Id.*).

In September 2003, John began working from his home office in Crete, Illinois, with MPC's approval. [8] (Pl. Resp. Def. Facts P 19). However, John still came to MPC's Chicago and Michigan facilities for various meetings. (Reicin Decl. P 21). Also, while John maintained customer files on his home computer, he would receive additional materials and information from MPC via email, telephone, and hard copy. (Pl. Resp. Def. Facts P 21; Berman Dep. at 152-54). John claims that he could not access MPC's computer system remotely from his home office, but Reicin testified that even though John worked from home, he "had full and unrestricted access to all of MPC's computer systems, including any passwords he may have needed to access MPC's network." (Reicin Decl. P 4).

> 8   Defendant claims that John resigned from MPC in September 2003, but stayed on as a technical consultant. (Def. Facts P 19). Reicin disputes this fact and claims that John did not resign until October 1, 2005. (Reicin Decl. P 4). Because we [*8] must make all inferences in favor of MPC for purposes of this motion, we will examine the facts as if John did not resign until October 1, 2005.

In October 2003, MPC learned that the Air Force [9] was soliciting bids for 200K tanks. (Pl. Facts P 28). MPC sent John and another employee to attend the 2003 Defense Energy Supply Center trade show in San Antonio, Texas to meet with military buyers. (*Id.*). There, John met Chief Joseph Mangum ("Mangum"), an Air Force representative involved in the selection of a tank provider, and John told Mangum that he was working as a consultant for MPC. (*Id.* PP 28, 29; Mangum Dep. at 128). In addition, John spoke with Colonel Vance of the U.S. Army about the military's problems with leaky tanks and fittings. (John 30(b)(6) Dep. at 87). Lawrence also met Mangum at this trade show. (Def. Facts Ex. XX at 47, 51; Mangum Dep. at 15).

> 9   While we acknowledge that the U.S. Air Force used purchasing agents for these tanks, such as Shawn Shrum ("Shrum") at SAIC (formerly ProcureNet), for purposes of this motion we will refer to all these entities as the "Air Force." (*See* Shrum Dep. at 5-8; Def. Facts 47).

On November 4, 2003, John emailed Ford indicating that MIL had [*9] been asked to submit a cost proposal to the Air Force for a 200K tank and asking Ford to review the cost and time it would take MIL to develop a new corner pattern. (Pl. Facts Ex. 24; Def. Facts P 27). John explained that a new corner pattern was needed to "overcome potential downstream harassment obstacles," but also indicated that if Ford owned the 20K corner design, then he should just "review [that 20K] corner design to work with wider fabric." (*Id.*). Ultimately, MIL turned down the offer to supply 20 200K tanks to the Air Force because it did not have the facilities to build the tanks and a larger order would have been required to cover the start up costs. (Def. Facts P 27; Lawrence Dep. at 46-47; John 30(b)(6) Dep. at 232).

The Air Force ended up awarding this contract for 20 200K tanks to MPC in early 2004, which eventually evolved into a contract for 80 tanks. (Pl. Facts PP 33, 34). [10] MIL supplied MPC with the hardware for these 80 200K tanks. (*Id.* P 33; Pl. Resp. Def. Facts P 30).

> 10   The Air Force had more than one supplier of 200K tanks in 2004. (Pl. Resp. Def. Facts P 29).

MPC leased a large indoor golfing facility in Kalamazoo, Michigan in late 2004 for the manufacturing and [*10] testing of these tanks. (*Id.* P 38). MPC hired Lawrence to run the Kalamazoo facility as an

independent contractor. [11] (*Id.* P 39; Def. Resp. Pl. Facts P 41). By September 20, 2004, MPC had manufactured its first 200K tank and invited Air Force representatives, including Peter Huber ("Huber"), to view the testing. (Pl. Facts P 40 & Ex. 31). Huber's report and testimony indicate that he believed that MPC was "subcontracting Moreland Internationals, or the services of John and Lawrence" and that John had retired from MPC. (*Id.* Ex. P 31; Huber Dep. at 51). However, he also testified that he believed that the facility and testing was being "subcontracted by [MIL] through MPC." (Huber Dep. at 53). In his report, Huber credited John and Lawrence for "many of the new ideas" and innovations of the design. (Pl. Facts Ex. 31).

> 11 Defendant claims that Lawrence was not subject to any confidentiality agreement, (Def. Facts P 24), which MPC disputes and claims that he "had an understanding with MPC to do this work and to maintain MPC's information as confidential." (Reicin Decl. P 22).

MPC shipped 24 200K tanks to the Air Force from September 28 through October 30, 2004. (*Id.* P 43). However, after MPC [*11] had shipped about 40 tanks, some tanks began to leak, and shipments were stopped in order to correct these problems. (Def. Facts P 33; Pl. Resp. Def. Facts P 33). Even with these issues, Mangum testified that MPC's fuel bladders were "head and shoulders better than the current bladders we had in the field." (Mangum Dep. at 59).

In December 2004, MPC put together a team of specialists to develop solutions to the leakage problems, which included John, Lawrence, George Fay, and Hector Hernandez ("Hernandez"). (Pl. Facts Ex. 35 at MIL-001941). From January through May 2005, additional testing and improvements were made to MPC's tanks. (Pl. Facts PP 46-49). [12]

> 12 The parties dispute the extent of these improvements from the original 20K tank design. MPC claims that while the manufacturing process for the 200K tanks was similar to that of MPC's smaller tanks, it used different material, different heat and pressure settings, different speeds for welding equipment, as well as different sealing procedures to prevent leakage. (Hernandez Decl. PP 3,4). Defendant denies that the 200K presented any new challenges and relies on Ford's testimony that the 200K gallon tank was created "by merely increasing [*12] the size and number of panels" in the 20K design. (Def. Resp. Pl. Facts P 35; Ford Decl. P 7; John Decl. P 15).

In August 2005, the Air Force received emergency funding to purchase additional 200K tanks and had until September 30, 2005 to allocate this funding. (*Id.* P 56). Mangum was directed to buy fuel bladders from "two or more manufacturers," and thus "no one company was going to get the entire order." (Mangum Dep. at 71, 152). The Air Force approached at least four different manufacturers, including MIL, MPC, GTA, and Dunlop, regarding this order. (*Id.* at 68, 90).

The Air Force ultimately received bids from at least three companies: MIL, MPC, and Dunlop. (Mangum Dep. at 90; Shrum Dep. at 42). Despite multiple bidders, MPC claims that only it and MIL were able to fulfill this contract because of the other bidders' issues, such as with the contract warranty provision. However, Mangum testified that two other manufacturers, GTA and AM Fuel, were "not ruled out," and that if MIL had not been able to supply tanks those orders would not have gone to MPC. (Pl. Facts P 56; Mangum Dep. at 72, 92).

John and Mangum discussed the potential for MIL to manufacture these 200K tanks, and on August [*13] 22, 2005, MIL bid for the contract. (Pl. Facts PP 58, 59). MIL's price was higher than MPC's 2004 price, and included additional money for the first tank to help pay for MIL's start up costs. (Def. Facts P 49; Shrum Dep. at 56). As of September 28, 2005, Mangum had chosen MIL to supply 64 tanks, but John had not informed MPC that MIL was pursuing this contract. (Pl. Facts PP 60, 61). On October 6, 2005, the Air Force ordered an additional 36 tanks from MIL. (Def. Facts P 54).

MPC began negotiating for this contract in August 2005 and submitted a bid on September 28, 2005. (Reicin Decl. P 24; Pl. Facts P 62). John contributed to these negotiations on behalf of MPC. (*Id.* P 5; John Dep. at 161). During this time, however, he did not mention that he was working on a proposal for MIL to supply the Air Force with 200K tanks. (*Id.* at 162). After negotiations regarding the warranty provisions, MPC received purchase orders for 52 tanks in November 2005. (Pl. Facts P 67; Def. Facts Ex. III). John resigned from MPC, effective October 1, 2005, and Lawrence stopped working with MPC in the Kalamazoo facility in mid-September 2005. (Lawrence Decl. P 14).

On October 3, 2005, John sent an email to Ford [*14] discussing corner pattern details, attaching photographs of competitors' tanks, and stating that "Larry feels that using this corner pattern approch [sic], should be enough of a difference to illustrate that it is a new corner detail for MIL that is esthetically pleasing to the eye as well as being extremely functional." (Pl. Facts Ex. 50). MPC claims that this email is evidence that MIL's corner design derived from MPC's design. (*Id.* P 71). On October 8, 2005, John sent Ford drawings for MIL's 200K tank, which MPC claims are similar to MPC's drawings. (*Id.* P 72; Def. Resp. Pl. Facts P 72).

On November 22, 2005, John emailed Ford and discussed having a dinner to "talk about corner geometry options and a defense plan." (Pl. Facts Ex. 52). In response to Ford's questions regarding John's design, John referenced Ford's 20K tanks and stated that his "objective is it to have a slightly different corner pattern and avoid conflict of being accused of having made a direct copy of someone else's corner design." (*Id.* Ex. 53 at MIL-233). He also asked Ford whether one of his suggestions was "enough of a change to say that we did not do an exact corner copy" and attached drawings of Ford's prior [*15] corner design for MPC. (*Id.* P 76 & Ex. 53 at MIL-233). MIL denies that it used John's options from this correspondence and claims that Ford actually designed an entirely new corner design. (Def. Resp. Pl. Facts P 77; Def. Facts P 13). MPC claims that any changes Ford made were "only cosmetic . . . to create the impression that they were designing the Moreland tank afresh." (Pl. Resp. Def. Facts P 13).

After filing this case on December 9, 2005, MPC filed an amended complaint on June 19, 2006, alleging: (1) copyright infringement of MPC's drawing "Soft Shell Tank - Access Manway & Gauge Port" ("Count I"); (2) copyright infringement of MPC's drawing "Soft Shell Tank - Access Manway Discharge Assembly" ("Count II"); violation of the Lanham Act, *15 U.S.C. § 1125(a)* ("Count III"); (4) violation of the Computer Fraud and Abuse Act ("CFAA"), *18 U.S.C. § 1030* ("Count IV"); (5) violation of Illinois Uniform Deceptive Trade Practices Act ("UDTPA"), *815 ILCS 510/2*; (6) violation of the Illinois Trade Secrets Act ("ITSA"), *765 ILCS 1065/1* ("Count VI"); (7) breach of fiduciary duty ("Count VII"); and (8) tortious interference with prospective economic advantage ("Count VIII"). On August 10, 2006, [*16] we granted Defendants' motion to dismiss Count III. On January 2, 2008, MPC filed a second amended complaint, and on April 17, 2008, we granted in part and denied in part MPC's motion to strike Defendants' affirmative defenses.

**STANDARD OF REVIEW**

Summary judgment is proper when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56*. A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)*. This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986)* (internal quotations omitted).

Once the moving party meets this burden of production, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather "must set [*17] forth specific facts showing that there is a genuine issue [of material fact] for trial." *Fed. R. Civ. P. 56(e)*. In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true and draw all inferences in that party's favor. *See Anderson, 477 U.S. at 255*.

**ANALYSIS**

Defendants argue that they are entitled to summary judgment on all remaining eight counts. We address each count below.

**I. Trade Secret Misappropriation (Count VI)**

In order to prove misappropriation of trade secrets under ITSA, a plaintiff must demonstrate three factors: "that the information at issue was a trade secret, that it was misappropriated, and that it was used in the defendant's business." *Learning Curve Toys, Inc. v. Playwood Toys, Inc., 342 F.3d 714, 721 (7th Cir. 2003)*. Defendants argue that MPC has failed to show that: (1) the information at issue qualifies as a trade secret; and (2) Defendants misappropriated or used MPC's alleged trade secrets.

**A. Trade Secret**

To qualify as a "trade secret" under ITSA, information must be "(1) sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from [*18] its disclosure or use; and (2) . . . the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." *765 ILCS 1065/2(d)*. These two requirements "emphasize different aspects of secrecy." *Learning Curve, 342 F.2d at 722*. The first requirement, "'precludes trade secret protection for information generally known or understood within an industry even if not to the public at large.'" *Id.* (quoting *Pope v. Alberto-Culver Co., 296 Ill. App. 3d 512, 515, 694 N.E.2d 615, 617, 230 Ill. Dec. 646 (1st Dist. 1998)*). The second requirement "prevents a plaintiff who takes no affirmative measures to prevent other from using its proprietary information from obtaining trade secret protection." *Id.* (citations omitted).

In addition, Illinois courts refer to the six Restatement factors as "instructive guidelines for ascertaining whether a trade secret exists under the Act," but not as "a list of requisite elements." *Learning Curve, 342 F.3d at 722*. These factors include:

> (1) the extent to which the information is known outside of the plaintiff's business;
>
> (2) the extent to which the information is known by employees and others involved in the plaintiff's business; (3) the extent [*19] of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff's business and to its competitors; (5) the amount of time, effort, and money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (citations omitted); *see also Pope, 296 Ill. App. 3d at 516-17, 694 N.E.2d at 618* (citations omitted). Determining whether something is as a trade secret "requires an ad hoc evaluation of all the surrounding circumstances," and thus "the existence of a trade secret ordinarily is a question of fact." *Learning Curve, 342 F.3d at 723*.

MPC's alleged trade secrets include its: (1) 200K tank design; and (2) pricing and bidding information. [13] Defendants argue that none of these qualify as trade secrets as a matter of law, but MPC responds that issues of material fact remain.

> 13 Defendants' motion states that MPC is claiming trade secret protection for its "sensitive customer information." (Mot. at 7). However, we cannot find these allegations in MPC's Second Amended Complaint. (*See* 2d Am. Compl.). In addition, to the extent [*20] that MPC is alleging protection for its customer information, it has waived these arguments as it did not address them in its response.

**1. MPC's 200K tank design**

Defendants claim that the two basic components of MPC's 200K tank, the fabric shell and the hardware, cannot be trade secrets because they were neither sufficiently secret, nor subject to reasonable efforts to maintain their secrecy. Specifically, Defendants claim that they were created by outside entities not subject to confidentiality agreements, easily duplicated, revealed to the public in drawings with product shipments, and disclosed in a patent. (Mot. at 3-6).

MPC responds that Defendants oversimplify the design, which consists of more than two components. These include:

> (1) the design of the rounded corners; (2) the welding methods developed by MPC to prevent leaking in the 200K tank, including the temperature settings and pressure settings; (3) hardware design, including the design on the manway, drawings and vents; (4) seam patterns designed to prevent leakage at the seam; [TEXT REDACTED BY THE COURT.]; (6) packaging procedure for [TEXT REDACTED BY THE COURT.] pounds of fabric; (7) dimensions of the tank when it is lying [*21] flat in an empty state; and (8) the overall construction process and design for the flexible fuel tanks, including the design for the panel layout, the location of the hardware and the

placement of the chafing patches.

(Pl. Facts P 50). MPC claims that all of these factors together constitute its trade secret. *See Minn. Mining & Mfg. Co. v. Pribyl, 259 F.3d 587, 595-96 (7th Cir. 2001)*.

As noted earlier, the Seventh Circuit and Illinois courts have instructed us to consider the six Restatement factors when evaluating the existence of a trade secret. *See Learning Curve, 342 F.3d at 723-30* (evaluating each Restatement factor to determine whether court was correct in ruling that trade secret does not exist as a matter of law). Examining these factors below, we find that they weigh in MPC's favor. [14]

> 14 We do not address in detail the first, fourth, fifth, and sixth Restatement factors. The first Restatement factor examines whether "[s]omething which is of general knowledge within an industry cannot be a trade secret." *ILG Indus., 49 Ill. 2d at 93, 273 N.E.2d at 396*. Examples include "something which is fully and completely disclosed by a business through its catalogs or literature disseminated [*22] throughout an industry." *Id.* While Defendants argue that the 200K was sufficiently known in the industry because outsiders, who were not subject to confidentiality agreements, created the tanks, these arguments are best addressed in the second Restatement factor.
>
> Addressing the sixth factor, ease of duplication, we find that it weighs in MPC's favor. "Matter which are readily and completely disclosed by the product itself [cannot] constitute a trade secret." *ILG Indus., 49 Ill. 2d at 93, 273 N.E.2d at 396*. Defendants argue that MPC's fabric shell and hardware cannot be trade secrets because they were used in plain view. (Mot. at 5). MPC respond that its tanks were only used in highly restricted military areas and that many of its design techniques, such as "seam work, [FOOTNOTE REDACTED BY THE COURT.], welding techniques, some of its corner design, and some of its hardware design, [were] not visible upon mere inspection." (Resp. at 30). Viewing the evidence in a light most favorable to MPC, we find that Defendants have not established as a matter of law that MPC's 200K tanks were easy to duplicate.

In addition, the fourth and fifth factors, the value of the concept to competitors and [*23] the amount of time, effort, and money expended, are not addressed in detail by the parties. However, we find that these two factors suggest that the existence of a trade secret in this case remains a factual question. *See Learning Curve, 342 F.3d at 714* (noting that there is no "per se requirement of developmental costs" and not required in all cases); (*see also* Mangum Dep. at 59-60 ("[E]ven though [MPC's 200K tanks] were having problems, they were head and shoulders better than the current bladders we had in the field.")).

### a. Extent to Which Known to Employees and Others Involved in MPC's Business

Turning to the second factor, Defendants argue that MPC's 200K tank design is not a trade secret because Ford, MIL, and Lawrence had knowledge of its design and had no duties of confidentiality. First, Defendants claim that Ford, an independent contractor, was not subject to a written confidentiality agreement, but was responsible for designing the panel layout and rounded corner pattern, the two differentiating features of MPC's 200K tanks. (Mot. at 4). However, an independent contractor's duty to maintain the secrecy of his client's trade secret may exist even in the absence of a written [*24] confidentiality agreement. *See Hicklin Eng'g, L.C. v. R.J. Bartell, 439 F.3d 346, 349-50 (7th Cir. 2006)*. The Seventh Circuit has explained two situations where such a duty may arise: (1) where the independent contractor developed the work product but norms of the trade establish that the client is the owner; or (2) where the client develops the information and a reasonable jury could conclude that the contractor knew that some of the data was meant to be a trade secret, such as where there are trade norms of confidentiality. *Id.*

MPC claims that the second of these situations applies because Ford merely implemented MPC's initial suggestion to use rounded corners. (Pl. Facts P 14). Thus, MPC claims that Ford was bound by the confidentiality provisions of the National Society of Professional Engineers Code of Ethics. [15] *See Hicklin, 439 F.3d at 350*. In addition, MPC argues that Ford's work was limited to the 20K and 50K tanks, and thus he did not contribute to the "seam allowances and placement, hardware placement, chafing patches, welding techniques, and [FOOTNOTE REDACTED BY THE

COURT.]" in the 200K tanks. (Resp. at 36).

15 Article III.4 of the Code of Ethics states:

> "Engineers shall not [*25] disclose, without consent, confidential information concerning the business affairs or technical processes of any present or form client or employer, or public body on which they serve." Article II.1.c instructs: "Engineers shall not reveal facts, data, or information obtained in a professional capacity without the prior consent of the client or employer except as authorized or required by law or this Code."

(Pl. Facts Ex. 61).

With respect to the 200K tank hardware, Defendants claim that all of MPC's hardware came from MIL, which was not bound by any obligation of secrecy. (*Id.*). MPC responds that both John and Adduci designed the hardware for the 200K tanks, while John was working for MPC. (Resp. at 37). Defendants reply that even if John was working for MPC at that time, these designs were made available to MIL when it manufactured the hardware for MPC. Finally, Defendants claim that the remaining elements of MPC's tank design were disclosed to Lawrence, including the welding methods, [FOOTNOTE REDACTED BY THE COURT.], the packaging procedures, and the overall construction process for the tank. (Reply at 5). Defendants emphasize that Lawrence was not subject to any written confidentiality [*26] agreement. *Id.*

We find that fact issues remain with respect to this Restatement factor. For example, the parties dispute the extent of MPC's instruction of Ford's work and Adduci's contributions to the hardware design. [16] Most significantly, however, neither Ford, MIL, nor Lawrence was responsible for or had knowledge of all of the eight claimed elements of MPC's alleged trade secret. Thus, Defendants have not shown as a matter of law that outsiders had knowledge of MPC's complete trade secrets. *Minn. Mining, 259 F.3d at 595-96*. ("A trade secret can exist in a combination of characteristics and components, each of which by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret."). [17]

16 MPC claims that Ford merely implemented John's email instructions to use a rounded corner. (Pl. Facts P 58). Defendants argue that this type of instruction is not enough to give rise to an independent duty of confidentiality as explained in *Hicklin.* (Reply at 3).

17 Defendants also argue that MPC freely gave up its trade secrets when it sold its 200K tanks to the Air Force according to the [*27] terms of the purchasing order. (Reply at 6; Def. Facts Ex. H at SAIC 0005 (the purchase order states that "any work performed [by MPC] . . shall not be deemed confidential or proprietary unless expressly agreed to in writing by the parties or otherwise protected under applicable law." In addition, "[a]ll evaluations, reports, records, and other work products produced by Seller pursuant to a Purchase Order shall be considered proprietary technical data belonging to the Customer."); *see also* Mangum Dep. at 35). Defendants claim that this language means that all drawings that MPC provided to the Air Force lost any trade secret protection and actually became the property of the Air Force. (Reply at 6).

We find it unnecessary, however, to determine the precise meaning of the Air Force's contract language at this time. This is because even assuming that the drawings provided with the 2004 200K tank contract with the Air Force were not MPC's confidential information and deemed proprietary information of the Air Force, issues of fact remain with respect to the 2005 200K tank order since subsequent modifications were made to those tanks to fix leakage problems. (Pl. Facts PP 46-49). In addition, [*28] viewing the evidence in a light most favorable to MPC, it is possible that Defendants' alleged misappropriation was complete before the 2005 purchase orders were received by MPC in November 2005 since MIL's corner pattern appears to have been developed in October 2005. (Pl. Facts P 72; Def. Resp. Pl. Facts P 72); *see also Learning Curve, 342 F.3d at 729* ("Until disclosed by sale the trade secret should be entitled to protection." (internal citations

omitted)).

### b. Measures Taken By MPC to Guard Secrecy of Tanks

Whether security measures are reasonable is a question of fact, and "only in an extreme case can what is a 'reasonable' precaution be determined [as a matter of law], because the answer depends on a balancing of costs and benefits that will vary from case to case.'" *Learning Curve, 342 F.3d at 725* (quoting *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc., 925 F.2d 174, 179 (7th Cir. 1991)*; *PRG-Schultz Int'l, Inc. v. Kirix Corp., No. 03 C 1867, 2003 U.S. Dist. LEXIS 25994, at *19-20 (N.D. Ill. Sept. 19, 2003)*; *cf. Web Commc'ns Group, Inc. v. Gateway 2000, Inc., 889 F. Supp. 316, 320 (N.D. Ill. 1995)* (finding no trade secret as a matter of law where plaintiff took "*virtually no steps* [*29] to insure the confidentiality of the [alleged trade secret]" (emphasis added)). In addition, to determine what is reasonable, we must take into account the "size and sophistication of the parties as well as the relevant industry." *Learning Curve, 342 F.3d at 726*.

MPC identifies various efforts it made to keep its trade secrets confidential [18] and reiterates that failure to get written confidentiality agreements from everyone who provided work for MPC is not dispositive of this issue. (Resp. at 34; Benjamin Beiler ("Beiler") Dep. at 55-59 (explaining that it was not company policy to have all employees sign confidentiality agreements until 2005)); *see also PRG Int'l, No. 03 C 1867, 2003 U.S. Dist. LEXIS 25994, at *19-20* (finding issue of fact remained even though plaintiff did not secure written confidentiality agreements from all independent contractors).

> 18  These measures include:
>
> "(1) MPC marked its 200K tank drawings as confidential and proprietary; (2) computer access to MPC's drawings and designs was restricted to authorized personnel; (3) MPC's exterior doors, reception area, interior offices, cabinets and drawers are all locked after hours; (4) MPC's drawings and trade secrets are [*30] kept under lock and key in interior offices; (5) a fence surrounds MPC's facilities and visitors to MPC's facilities have to have an escort; (6) MPC employees understood and were expected to keep design information confidential; (7) MPC's facilities are equipped with Honeywell security systems; (8) MPC pays a local police officer to patrol the facility after hours when the officer is off duty; (9) and the general nature of the work, particularly due to its military application, required confidentiality."
>
> (Pl. Facts P 51).

Defendants claim that these measures are insufficient as a matter of law because while they may have been used at MPC's Chicago facility, many of them were not employed at the Kalamazoo facility. (Reply at 7-8; John Supp. Decl P 7 (stating that steps (5), (7), and (8) were not employed in Kalamazoo and that none of the workers at the Kalamazoo facility were required to sign confidentiality agreements)). This, however, does not address the other measures that MPC claims to have taken with respect to its drawings. In addition, given that reasonableness of security measures is a factual question, we decline to decide it as a matter of law. Accordingly, factual issues remain [*31] with respect to whether MPC's 200K tank qualifies as a trade secret.

### 2. MPC's Pricing and Bidding Information

MPC alleges that Defendants misappropriated trade secrets including its "pricing and cost information relating" to "its Soft Shell Tanks." (2d Am. Compl. P 58). In its response brief, MPC claims that because John knew of the confidential pricing and negotiated warranty provision in MPC's 2005 proposal, he was able to use this information to assist in MIL's negotiations with the Air Force. (Resp. at 31-32, 40).

While MPC has shown that this information was intended to be confidential, (*see* Pl. Facts P 68 (citing John's testimony that proposal was confidential)), confidentiality alone is not enough to demonstrate that information qualifies as a trade secret. *See* Restatement of Torts § 757 (2008) ("[A trade secret] differs from other secret information in a business . . . in that it is not simply information as to single or ephemeral events in the

conduct of the business, as, for example, the amount or *other terms of a secret bid for a contract* or the salary of certain employees." (emphasis added)); *see also Maine v. Standard & Poor's Corp., No. 89-3725, 1990 U.S. App. LEXIS 20507, at *7 (7th Cir. Nov. 19, 1990)* [*32] (unpublished Seventh Circuit case quoting Restatement language). Specifically, the terms of a bid generally are not entitled to trade secret protection. *Stenstrom Petroleum Servs. Group, Inc. v. Mesch, 375 Ill. App. 3d 1077, 1093-95, 874 N.E.2d 959, 974-75, 314 Ill. Dec. 594 (2d Dist. 2007)* (finding that elements of bid, including pricing information and methods of calculation, were not trade secrets). In addition, MPC has not cited any cases indicating otherwise. Thus, MPC's pricing and warranty provisions are not trade secrets, and we grant summary judgment with respect to this portion of MPC's trade secret claim.

### B. Misappropriation

"'Misappropriation' of trade secrets under [ITSA] can be shown one of three ways, by improper acquisition, unauthorized disclosure, or unauthorized use." *Liebert Corp. v. Mazur, 357 Ill. App. 3d 265, 281, 827 N.E.2d 909, 925, 293 Ill. Dec. 28 (1st Dist. 2005)*; *see also Rotec Indus., Inc. v. Mitsubishi Corp., 179 F. Supp. 2d 885, 894 (C.D. Ill. 2002)* (granting summary judgment where plaintiff failed to demonstrate that defendant actually used its trade secrets). MPC appears to be pursuing the third option: John was not authorized to disclose the trade secret information, and therefore, Defendants [*33] were unauthorized to use this information.

First, even though John may have been authorized as an Executive Vice President of MPC to receive the allegedly trade secret information, this does not mean that he cannot be found guilty of misappropriation. To the contrary, ITSA's definition of "misappropriation" includes those who, by virtue of their position, owe a duty to keep information confidential, but nevertheless disclose or use that information in a manner inconsistent with its owner's consent. *See 765 ILCS 1065/2(b)*; *see also Int'l Airport Ctrs., LLC v. Citrin, 440 F.3d 418, 421 (7th Cir. 2006)* (finding that an employee who breaches his duty of loyalty to his employer acts without authorization). Thus, if John was acting against MPC's interests when he acquired the trade secret information, then he may be liable for misappropriation if he later used or disclosed that information against the interests of MPC.

We also find that material questions of fact remain regarding whether Defendants used MPC's 200K tank trade secret. MPC has presented evidence which could lead a reasonable jury to find that Defendants' 200K tank derived from MPC's 200K tank. *See Mangren Research & Dev. Corp. v. Nat'l Chem. Co., 87 F.3d 937, 944 (7th Cir. 1995)* [*34] ("[T]he user of another's trade secret is liable even if he uses it with modifications or improvements upon it effected by his own efforts, so long as the substance of the process used by the actor is derived from the other's secret."). For example, John repeatedly referenced MPC's 200K tank design in his email correspondence with Ford. (Pl. Facts PP 31, 71, 77). His November 4, 2003 email instructed Ford to modify MIL's design to avoid "potential harassment obstacles" (*Id.* P 31); his October 3, 2005 email asked if MIL's new corner design was "enough of a difference that [to be] a new corner detail for MIL" (*Id.* P 71); and his December 7, 2005 email stated that his "objective is to have a slightly different corner pattern and avoid conflict of being accused of having made a direct copy of someone else's corner design." (*Id.* P 77). Thus, we find that issues of fact remain with respect to whether Defendants misappropriated MPC's 200K tank design.

## II. Breach of Fiduciary Duty (Count VII)

To recover for breach of fiduciary duty, MPC must establish: "(1) a fiduciary duty on the part of the defendant, (2) the defendant's breach of that duty, and (3) damages that were proximately caused by [*35] the defendant's breach." *DOD Techs. v. Mesirow Ins. Servs., Inc., 381 Ill. App. 3d 1042, 887 N.E.2d 1, 320 Ill. Dec. 221, 2008 WL 423444, at *2 (Ill. App. 1st Dist. Feb. 14, 2008)* (citing *Neade v. Portes, 193 Ill. 2d 433, 444, 739 N.E.2d 496, 502, 250 Ill. Dec. 733 (2000))*.

### 1. Duty

In order to determine John's duty to MPC, we must first determine whether he was an "employee" [19] or an "officer." *See Aon Risk Servs., Inc. of Ill. v. Shetzer, No. 01 C 7813, 2002 U.S. Dist. LEXIS 16035, 2002 WL 1989466, at *5 (N.D. Ill. Aug. 27, 2002)*. "While both employees and officers owe a duty to a corporation, officers 'stand on a different footing.'" *Superior Envtl. Corp. v. Mangan, 247 F. Supp. 2d 1001, 1002 (N.D. Ill. 2003)* (quoting *Veco Corp. v. Babcock, 243 Ill. App. 3d 153, 160, 611 N.E.2d 1054, 1059, 183 Ill. Dec. 406 (1st Dist. 1993))*. To determine whether someone is an officer under Illinois law, courts look at the defendant's

management responsibilities, the extent of corporate oversight and guidance over him, as well as whether "he exercised certain powers of an officer or agent with the approval and recognition of the corporation" regardless of whether he was a "formally elected corporate officer." *Superior Envtl., 247 F. Supp. 2d at 1002-03* (citing *H & H Press, Inc. v. Axelrod, 265 Ill. App. 3d 670, 679, 638 N.E.2d 333, 339, 202 Ill. Dec. 687 (1st Dist. 1994))*; [*36] *see also FoodComm Int'l v. Barry, 328 F.3d 300, 303 (7th Cir. 2003)* (applying fiduciary duties to defendants even though they were not formally "officers"). In addition, this determination is a factual question. *See Hay Group, Inc. v. Bassick, No. 02 C 8194, 2005 U.S. Dist. LEXIS 22095, 2005 WL 2420415, at *9-10 (N.D. Ill. Sept. 29, 2005)* (denying summary judgment because factual questions remained regarding defendants' responsibilities and oversight in order to determine whether they were "officers").

> 19  As explained above, we recognize that the parties dispute whether John was an employee or an independent contractor once he began working from home. MIL claims that John resigned from MPC in 2003, but that he continued to work for MPC as an independent contractor, working from home, until October 1, 2005. (Def. Facts P 19). MPC, on the other hand, claims that John remained Executive Vice President until his resignation on October 1, 2005. (Pl. Resp. Def. Facts P 19). Because we must draw all inferences in MPC's favor for purposes of summary judgment, we will assume that John was at the minimum an employee of MPC until October 1, 2005.

While neither party here explicitly argues this issue, they dispute it in their [*37] statements of fact. (*See* Pl. Facts P 1, Def. Resp. Pl. Facts P 1). Defendants claim that John is not an officer because he is not listed on MPC's May 25, 2005 Secretary of State filing. (*See* Def. Facts Ex. UU). This document is not dispositive, however, because MPC has provided evidence that John was an Executive Vice President of MPC, he had significant managerial duties, and that MPC was not "precise" about formally denoting its staff as "officers." (*See* Reicin Dep. at 24-27). Therefore, drawing all inferences in MPC's favor, we will assume John was an officer for purposes of determining his duty to the corporation.

**2. Breach**

Officers "owe a fiduciary duty of loyalty to their corporate employer not to (1) actively exploit their positions within the corporation for their own personal benefit, or (2) hinder the ability of the corporation to continue the business for which is was developed." *Veco Corp., 243 Ill. App. 3d at 160, 611 N.E.2d at 1059*. For example, Illinois courts have found that officers breach their fiduciary duties when "while still employed by the company they (1) fail to inform the company that employees are forming a rival company or engaging in other fiduciary breaches; [*38] [or] (2) solicit the business of a single customer before leaving the company," *FoodComm, 328 F.3d at 303*; or (3) "use the company's confidential business information for the new business either before or after [their] departure." *Cooper Linse Hallman Cap. Mgmt., Inc. v. Hallman, 368 Ill. App. 3d 353, 357, 856 N.E.2d 585, 589, 305 Ill. Dec. 780 (1st Dist. 2006)*. Furthermore, while an employee may compete with a former employer after departure and is subject to the "preliminary stages doctrine" [20] prior to departure, an officer's resignation does "'not sever liability for transactions completed after termination . . . for transactions which: (1) began during the existence of the relationship; or (2) were founded on information acquired during the relationship.'" *Exhibit Works, Inc. v. Inspired Exhibits, Inc., No. 05 C 5090, 2005 U.S. Dist. LEXIS 34909, 2005 WL 3527254, at *3 (N.D. Ill. Dec. 21, 2005)* (quoting *Dowell v. Bitner, 273 Ill. App. 3d 681, 691, 652 N.E.2d 1372, 1379-80, 210 Ill. Dec. 396 (4th Dist. 1995))*.

> 20  This doctrine "permits an employee to plan, form, and outfit a competing corporation while still working for the employer so long as he does not commence competition." *Riad v. 520 S. Mich. Ave. Assocs., No. 97 C 2488, 2000 U.S. Dist. LEXIS 7646, 2000 WL 680217, at *3 (N.D. Ill. May 22, 2000)* [*39] (citing *Voss Eng'g, Inc. v. Voss Indus., Inc., 134 Ill. App. 3d 632, 635-36, 481 N.E.2d 63, 89 Ill. Dec. 711 (1st Dist. 1985))*.

In the instant case, MPC has presented sufficient evidence to survive summary judgment that prior to John's resignation: (1) he began negotiating with Mangum about the possibility that MIL would produce 200K tanks (Pl. Facts PP54, 57); and (2) he may have used information he acquired while at MPC after his resignation (*see* supra Section I.B). While Defendants

focus on what MIL refrained from doing until after John resigned (i.e., lease a facility, secure bank financing, purchase supplies) and the fact that Mangum approached John, even negotiations may be sufficient to hold an officer liable for breach of his fiduciary duty, regardless of whether the officer initiated the discussions. *See Sain v. Nagel, 997 F. Supp. 1002, 1016 (N.D. Ill. 1998)* ("Under the corporate opportunity doctrine, one who occupies a fiduciary relationship to a corporation may not acquire, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or which is essential to its existence." (internal citations omitted)); *see also Veco Corp., 243 Ill. App. 3d at 160-61, 611 N.E.2d at 1059* [*40] (while an employee may compete with former employers so long as "there was no demonstrable business activity by the former employee before the termination of employment, . . . the law governing the right of former employees to compete is distinct and irrelevant to a breach of fiduciary duty claim against officers").

**3. Damages**

Defendants also argue that they are entitled to summary judgment because MPC has not proven that it suffered any damage as a result of John's breach of fiduciary duty. *See DOD Techs., 381 Ill. App. 3d 1042, 887 N.E.2d 1, 320 Ill. Dec. 221, 2008 WL 423444, at *2*. A corporation may recover "an employee's total compensation paid during the time period that an employee was breaching fiduciary duties owed the employer." *Veco Corp., 243 Ill. App. 3d at 165, 611 N.E.2d at 1062*. It may also recover "inferential lost profits." *Am. Laser Prods. v. Nat'l Imaging Supplies Group, No. 94 C. 7624, 1996 U.S. Dist. LEXIS 18000, at *5 (N.D. Ill. Dec. 2, 1996)*. We find that factual issues remain regarding damages. While Defendants have shown that MPC would not have been awarded the entire 2005 Air Force contract, we believe that whether it would have received an order for more than 52 200K tanks remains a factual issue. [*41] In addition, MPC's damages may include John's salary if he breached his fiduciary duties.

**4. Waiver**

Defendants argue that even if John competed with MPC prior to resigning, MPC has waived its fiduciary duty claim because it acquiesced to this competition. (Mot. at 22; Reply at 10-11). A claim for breach of fiduciary duty may only be waived "deliberately by the corporation; in other words, such a decision must eventually be *ratified* or expressly *affirmed* by the corporation." *TMF Tool Co., Inc. v. Siebengartner, 899 F.2d 584, 589 (7th Cir. 1990)*. In addition, the corporation's decision must be "'specific as to the particular breach'" at issue. *Id. at 589-90* (quoting Robert C. Montgomery, The Fiduciary Duties of General Partners, 17 Colo. Law. 1959, 1964 (1988)).

Here Defendants claim MPC waived its fiduciary duty claim because it knew that: (1) John had another company while he worked for MPC; (2) MIL competed with MPC in the fuel tank liner business; and (3) MIL had supplied hoses to the Air Force. (Reply at 10-11). However, these actions are not enough to establish as a matter of law that MPC either expressly ratified or affirmed John's competition in the 200K fuel tank business. In fact, [*42] it is undisputed that John "did not inform MPC that he was working on a proposal for Moreland International to supply 200K tanks to the Air Force." (Def. Resp. Pl. Facts P 61). Accordingly, Defendants are not entitled to summary judgment on Count VII.

**III. Copyright Infringement (Counts I & II)**

MPC claims that Defendants infringed two of its copyrighted drawings depicting the "access manway & gauge port" and "access manway discharge assembly" for its 200K tanks. (Resp. at 24). "To establish copyright infringement, a plaintiff must prove two elements: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Susan Wakeen Doll Co. v. Ashton Drake Galleries, 272 F.3d 441, 450 (7th Cir. 2001)* (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co, Inc., 499 U.S. 340, 361, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991))*. In addition, "[t]he registration of a copyright certificate creates a prima facie presumption of validity of a copyright." *Pickett v. Prince, 52 F. Supp. 2d 893, 901 (N.D. Ill. 1999)* (citing *17 U.S.C. § 410(c)*). A defendant may rebut this presumption, however, by producing evidence disputing plaintiff's prima face case. *Id.* Here, MPC has properly [*43] registered copyrights for the two drawings at issue and thus has established its prima facie case.

Despite this presumption, Defendants argue that they are entitled to summary judgment because MPC has failed to establish the "originality" required for ownership of a valid copyright. [21] Ownership of a valid copyright requires that the work at issue be "original." *See Feist,*

*499 U.S. at 345, 111 S. Ct. at 1287* ("The *sine qua non* of copyright is originality."). "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that is possesses at least some minimal degree of creativity." *Id.* Defendants have attempted to rebut MPC's prima facie case by arguing that the drawings are not entitled to copyright protection. Specifically, Defendants claim that the drawings are not "original" because: (1) MPC is not the author of the copyrighted works; and (2) the works are not sufficiently creative.

> 21   In their reply brief, Defendants argue for the first time even if MPC owns a valid copyright, it cannot demonstrate that Defendants copied this copyright because MIL's drawings are not "substantially similar" [*44] to MPC's drawings. *See Wakeen, 272 F.3d at 450* (citing *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp., 672 F.2d 607, 614 (7th Cir. 1982))* ("Given that direct evidence of copying is normally unavailable, 'copying may be inferred where the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work.'"). Defendants claim that they may assert this argument for the first time in reply because MPC mentioned that Defendants had not disputed this issue in their response. (*See* Reply at n.9). We disagree, and find that MPC's passing reference to arguments that Defendants did not make in their motion is not enough to permit Defendants to address this new argument in reply. (*See* Resp. at 24); *see also Sadowski, No. 07 C 2973, 2008 U.S. Dist. LEXIS 41766, 2008 WL 2224892, at *5*. This is especially the case here where the determination of whether drawings are "substantially similar" is a highly factual question. *See Wildlife Express Corp. v. Carol Wright Sales, Inc., 18 F.3d 502, 509 (7th Cir. 1994)* (explaining that test is "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully [*45] appropriated the plaintiff's protectible expression by taking material of substance and value." (internal citations omitted)).

**A. Authorship**

The "'[a]uthor' is [the] party who actually creates the work, that is, the person who translates idea into fixed, tangible expression entitled to copyright protection." *Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 737, 109 S. Ct. 2166, 2171, 104 L. Ed. 2d 811 (1989)*; *see also Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1071 (7th Cir. 1994)*. If the work is for hire, 'the employer or other person for the work was prepared is considered the author' and owns the copyright, unless there is a written agreement to the contrary.'" *Cmty. for Creative Non-Violence, 490 U.S. at 737, 109 S. Ct. at 2171* (quoting *17 U.S.C. § 203(a)*).

Defendants claim that MPC is not the author because Lawrence designed the manway assemblies for MIL, John made the drawings for MIL with the help of Midwest WaterJet, and then Adduci merely copied these drawings from John's drawings. (Mot. at 24-25). First, as we noted above, it is a disputed issue of fact whether John was an employee or independent contractor. Thus, if he was a MPC employee when he allegedly created the drawings, then [*46] it is possible that he may be subject to the work-for-hire doctrine for the drawings that he claims that he created but that Adduci copied. *See 17 U.S.C. § 203(a)*. More significantly, the parties do not dispute that Adduci is the person who physically created the copyrighted drawings. (*See* Pl Facts Ex. 29). What they do dispute, however, is whether Adduci added anything of substance to these drawings or merely copied them. [22] Thus, their dispute focuses upon the "creativity" aspect required for originality as explained below. *See Feist, 499 U.S. at 348-49, 340 S. Ct. at 1289* (acknowledging that something may be original if there is creativity in the way a compiler of facts selects and arranges them).

> 22   While Defendants claim that Adduci created these drawings by copying and pasting MIL hardware designs onto one another, this is a disputed issue of fact. (*See* Def. Resp. Pl. Facts P 36). While we acknowledge that Adduci testified that he could not recall whether he copied these drawings from MIL drawings, he also testified that he contributed to the drawings and MPC claims that both Adduci and John designed the hardware components. (*See* Pl. Facts P 36; Adduci Decl. PP 8, 10, 11; Adduci [*47] Dep. at 39-40, 67-68). Because we must draw all inferences in favor of MPC, we find that MPC has sufficiently demonstrated that factual issues remain regarding the creation of these drawings.

### B. Creativity

To be entitled to copyright protection, "the requisite level of creativity is extremely low; even a slight amount will suffice . . . no matter how crude, humble or obvious it might be." *Feist, 499 U.S. at 345* (internal quotations omitted); *see also Buckley v. Hawkins, Ash, Baptie & Co., LLP, 329 F.3d 923, 929 (7th Cir. 2003)* (citing *Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99, 102-03 (2d Cir. 1951))* ("[T]he only 'originality' required for the new work to be copyrightable (the very term is a misnomer) is enough expressive variation from public-domain or other existing works to enable the new work to be readily distinguished from its predecessors."). Thus, "originality in this context means little more than a prohibition of actual copying." *Id.*

Defendants have included drawings of MIL hardware as evidence that MPC's were copied. (*See* Def. Facts Ex. GGG). Examining these drawings and MPC's two drawings at issue, we cannot find as a matter of law that they are so similar that no [*48] degree of creativity is present in MPC's drawings. (*Compare id., with* 2d Am. Compl. Exs. A-2 & C-2). Defendants also attempt to divide the drawings into five distinct elements and explain how each is copied from elsewhere, but as explained above, compilations of non-copyrightable elements may still be entitled to copyright protection if there is added creativity. Thus, we find that issues of fact remain with respect to Counts I and II.

### V. CFAA (Count IV)

MPC claims that John [23] is liable under CFAA for his unauthorized access of MPC's confidential information, as evidenced by the fact that "nearly every one of [its] exhibits is a document produced by Defendants, including almost all of MPC's drawings, that was stored on MPC's computers." (*See* Pl. Resp. Def. Facts P 69). Defendants argue that they are entitled to summary judgment because MPC has failed to prove that John acted without authority or exceeded his authority, that he "accessed" a computer, or that he had an intent to defraud.

> 23  Examining MPC's Second Amended Complaint and response brief, it appears that it is only pursuing a CFAA claim against John Moreland. (*See* 2d Am. Compl. PP 48, 49; Resp. at 42-43).

As an initial matter, [*49] MPC has never made clear which CFAA section it is seeking relief under. Therefore, we will review the three possibly relevant sections of CFAA: [24] *sections 1030(a)(2)(C),* [25] *1030(a)(4)*, and *1030(a)(5)*. [26] First, MPC has waived claims under *section 1030(a)(4)*. [27] Both of the remaining two sections require a plaintiff to demonstrate (1) that a defendant acted without authorization or exceeded his authorization, and (2) that the defendant "accessed" a computer. Defendants argue that MPC has not proved either factor.

> 24  Defendants' reply brief attempts to limit the relevant CFAA sections that may supply a cause of action under *18 U.S.C. § 1030 (g)*. However, this issue was not briefed by the parties and authority exists to the contrary. *See Theofel v. Farey-Jones, 359 F.3d 1066, 1078 n.5 (9th Cir. 2004)*; *Shamrock Foods Co. v. Gast, 535 F. Supp. 2d 962, 964 (D. Ariz. 2008)*.
> 25  Section *18 U.S.C. § 1030 (a)(2)(C)* provides: "[Whoever] intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer if the conduct involved an interstate or foreign communication."
> 26  *Section 1030(a)(5)* applies to whoever "intentionally [*50] accesses a protected computer without authorization, and as a result of such conduct [causes or] recklessly causes damage." *Id. § 1030 (a)(5)(A)(ii), (iii)*. Damage is defined as "any impairment to the integrity or availability of data, a program, a system, or information." *Id. § 1030(e)(8)*.
> 27  *Section 1030(a)(4)* applies to "whoever knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value." *18 U.S.C. § 1030 (a)(4)*. Defendants' motion argues that MPC has failed to prove "intent to defraud," as required under this section. (Mot. at 19-20). MPC does not respond to this argument and therefore its claims under *Section 1030(a)(4)* are waived.

### A. Authorization

Defendants argue that any MPC information that John received while working from home was

"authorized" because it was within the scope of his employment. However, in the Seventh Circuit, an employee acts "without authorization" after he breaches his duty of loyalty to his employer. *Citrin, LLC, 440 F.3d at 420-21* (finding that employee who accessed company laptop lost his "authority to access [*51] the laptop" when he breached his duty of loyalty as his "only authority had been [the employer/employee] relationship"). [28] Because factual issues remain as to whether John breached his fiduciary duties to MPC, as explained above, factual issues also remain with respect to whether he acted "without authorization" under CFAA when he allegedly accessed MPC's drawings and other confidential information. (*See* Pl. Resp. Def. Facts P 69). [29]

> 28  Defendants cite to cases outside of our circuit which disagree with *Citrin. See e.g. Diamond Power Int'l v. Davidson, No. 04 CV 0091, 540 F. Supp. 2d 1322, 2007 U.S. Dist. LEXIS 73032, at *46-47 (N.D. Ga. Sept. 28, 2007)* (disagreeing with *Citrin* and holding that "'without authorization' generally only reaches conduct by outsiders who do not have permission to access the plaintiffs computer in the first place"); *Brett Senior & Assocs. v. Fitzgerald, No. 06-1412, 2007 U.S. Dist. LEXIS 50833, at *8-9 (E.D. Pa. July 13, 2007)*; *Int'l Ass'n of Machinists & Aerospace Workers v. Werner Matsuda, 390 F. Supp. 2d 479, 499 (D. Md. 2005)*. However, we are bound to follow Seventh Circuit precedent.
>
> 29  Defendants also argue that John did not "exceed authorized access," because he did not "obtain [*52] or alter" any MPC information. *See 18 U.S.C. § 1030(e)(6)*. Through discovery, MPC identified at least one document that it claimed as evidence that John transferred confidential information from MPC's computer. (Mot. at 18; Def. Facts Ex. O). However, Defendants dispute the contents of this document by providing an affidavit from Jeff Newman ("Newman"), a consultant hired by Lawrence in September 2004 to analyze data on liquid volumes in MPC's 200K storage tanks in the Kalamazoo, Michigan testing facility. (Newman Decl. PP 3,5). Newman states that the documents at issue were copied by him onto a USB drive to perform data analysis from his home computer. (*Id.* PP 14-16). In addition, Defendants claim that testimony inferring that they deleted the gauging software from this computer only amounts to conjecture since John, Lawrence, and Newman all deny responsibility for its deletion. (*See* Beiler Dep. at 126-31; Newman Decl. P 18; John Decl. P 17; Lawrence Decl. P 9). MPC does not respond to these arguments, and therefore, they are waived.

**B. Access**

Defendants argue that they are entitled to summary judgment because John never "accessed" a protected computer as required under CFAA. (Mot. [*53] at 19). They claim that receiving emails with documents attached from MPC employees while working from home cannot qualify as "access" as a matter of law. Before turning to this argument, we acknowledge that there is a factual dispute regarding whether John accessed information exclusively through email. (*See* Pl. Resp. Def. Facts P 73). Specifically, Reicin testified that as an Executive Vice President, John "had full and unrestricted access to all of MPC's computer systems, including any passwords he may have needed to access MPC's network." (Reicin Decl. P 4). Thus, a factual question remains as to how John obtained MPC's information.

In addition, we decline to hold that receiving information via email can never qualify as "access" under CFAA. Upon examining *Role Models Am., Inc. v. Jimmie Jones, 305 F. Supp. 2d 564, 567 (D. Md. 2004)*, the only case Defendants cite for the proposition that receiving emails cannot qualify as "accessing" a computer, we find it distinguishable and note that it includes language which implies the opposite conclusion. In *Role Models,* a private school ("RMA") brought a CFAA claim against its former principal and the university that its principal attended [*54] ("NSU") alleging that its principal emailed its proprietary information to NSU as part of his dissertation. The court granted NSU's motion dismiss because the university never "accessed" RMA's computers as it had only received the principal's emails. The court, however, distinguished the facts before it from a situation where an email recipient actually "direct[s] or even encourage[s]" the sender to email the information, or where the sender acts as the recipient's agent. *Id. at 567-68*; *see also Shurgard Storage Ctrs., Inc. v. Safeguard Storage, Inc., 119 F. Supp 2d 1121, 1123-25 (W.D. Wash. 2000)* (denying motion to dismiss based upon allegations that defendant received emails containing trade secrets from plaintiff's employees acting as defendant's agents); *Am. Online, Inc. v. Nat'l Health*

*Care Discount, Inc.,* 121 F. Supp. 2d 1255, 1272-73 *(N.D. Iowa 2000)* (relying on dictionary definition, to interpret use of "access" as a noun in CFAA as meaning "to exercise the freedom to make use of something"). While we, like the court in *Role Models,* acknowledge that there is a difference between passively receiving an email and actively retrieving information via email, drawing all inferences [*55] in MPC's favor, we cannot conclude as a matter of law that MPC has failed to prove that John's actions fall into the latter category. *See Role Models, 305 F. Supp. 2d at 567.* [30]

> [30] Defendants argue for the first time in their reply brief that MPC has failed to prove "damages" under *18 U.S.C. § 1030 (a)(5)(A)(ii), (iii)*. (Reply at 15). However, it is improper to raise an argument for the first time in a reply because it deprives the plaintiff of an opportunity to respond. *See Sadowski v. Med1 Online, LLC, No. 07 C 2973, 2008 U.S. Dist. LEXIS 41766, 2008 WL 2224892, at *5 (N.D. Ill. May 27, 2008).*

**VI. Tortious Interference with Economic Advantage (Count VIII)**

A successful plaintiff must prove four elements for this tortious action:

> (1) plaintiff must have a reasonable expectancy of a valid business relationship with a third party; (2) defendant must know of the prospective business relationship; (3) defendant must intentionally interfere with the prospective business relationship such that the prospective business relationship never materializes; and (4) the interference must damage the plaintiff.

*Interim Health Care of N. Ill., Inc. v. Interim Health Care,* 225 F.3d 876, 886 (7th Cir. 2000) (internal quotations omitted); [*56] *LaSalle Bank Nat'l Ass'n v. Moran Foods, Inc.,* 477 F. Supp. 2d 932, 939 (N.D. Ill. 2007).

To demonstrate a reasonable business expectancy, a plaintiff need not prove that a contractual relationship existed with a third party, but it must show "more than a mere hope" of future business dealings. *Quadro Enters., Inc. v. Avery Dennison Corp., No. 97 C 5402, 2000 U.S. Dist. LEXIS 11568, at *34 (N.D. Ill. July 25, 2000).* For example, there may be a reasonable business expectancy to continue a non-contractual, at-will relationship. *See Dowd & Dowd, Ltd. v. Gleason,* 352 Ill. App. 3d 365, 381, 816 N.E.2d 754, 767-68, 287 Ill. Dec. 787 (1st Dist. 2004) ("[U]ntil terminated, the relationship created by an at-will contract will presumptively continue in effect so long as the parties are satisfied, and therefore, such a relationship is sufficient to support an action for tortious interference."); *La Rocco v. Bakwin,* 108 Ill. App. 3d 723, 731, 439 N.E.2d 537, 543, 64 Ill. Dec. 286 (2d Dist. 1982) (finding that interference with an oral, exclusive, at-will relationship between an attorney and a company "may be actionable even if the relationship is terminable at will"). However, merely submitting bids for future contracts or demonstrating [*57] a past contractual relationship may be insufficient to demonstrate a reasonable business expectancy. *See Quadro Enters., No. 97 C 5402, 2000 U.S. Dist. LEXIS 11568, at *34* (finding that "as a matter of law," no reasonable business expectancy existed where plaintiff "merely received an invitation to bid" because future business "was nothing more than a mere hope"); *Am. Laser Prods., Inc. v. Nat'l Imaging Supplies Group, Inc., No. 94 C 7624, 1996 U.S. Dist. LEXIS 3520, at *70-71 (N.D. Ill. Mar. 20, 1996)* (granting summary judgment on tortious interference claim because five past purchases was "not the quantity of business that give [plaintiffs] a reasonable expectation of a continued relationship"); *Int'l Serv. Assocs., Inc. v. Arco Mgmt. of Wash., No. 94 C 1807, 1994 U.S. Dist. LEXIS 15025, 1994 WL 583302, at *7 (N.D. Ill. Oct. 21, 1994)* (finding that a "track record" of past contracts was not enough to state a claim for tortious interference).

Defendants argue that MPC cannot establish that it reasonably expected to be the main supplier of tanks for the Air Force. (Mot. at 11). This is because the Air Force specifically stated that it was not going to award its 2005 contract to one manufacturer, and MPC had only [*58] supplied the Air Force with 200K tanks once before in 2004. (*Id.* at 11-13). MPC responds by analogizing its relationship with the Air Force to the relationships in *Dowd & Dowd, Ltd.* and *La Rocco.* MPC claims that it had a business expectancy because: its relationship with the Air Force began in 2003 and continues today; it and Bell Avon were the only approved suppliers of 200K tanks; from 2004 through 2005, it worked with the Air Force to perfect its tank; SAIC recommended only MPC for the 2005 contract; and if MIL had not bid, MPC would have been awarded a greater portion of the contract than the 52-tank order it received. (Resp. at 41).

We find MPC's arguments unconvincing. While MPC did contract with the Air Force in 2004 to supply 200k tanks and did submit a bid to supply additional tanks in 2005, these contacts alone are not enough to establish a reasonable business expectancy that it would be awarded any tanks, let alone greater than 52 tanks. *See Quadro Enters., No. 97 C 5402, 2000 U.S. Dist. LEXIS 11568, at *34*; *Am. Laser Prods., Inc., No. 94 C 7624, 1996 U.S. Dist. LEXIS 3520, at *70-71*. In addition, contrary to MPC's claims, Air Force representatives testified that they would [*59] not have awarded the entire contract to MPC if MIL had not bid and that there were multiple suppliers that might have supplied the remaining tanks. (*See* Mangum Dep. at 71-73, 90; Shrum Dep. at 42). Thus, as one of multiple bidders for the 2005 contract, MPC's expectation in receiving any orders, let alone greater than 52 tanks, was nothing more than a "mere hope" and not analogous to an at-will relationship.

Given that MPC has failed to demonstrate this first element, we need not reach the other elements and summary judgment is granted with respect to this count.

**VII. UDTPA (Count V)**

The UDTPA is designed to curb unfair trade practices that result in public deception, such as "conduct involving either misleading trade identification or false or deceptive advertising." *See 815 ILCS 510* prefatory note; *see also Labor Ready, Inc. v. Williams Staffing, LLC, 149 F. Supp. 2d 398, 413 (N.D. Ill. 2001)* ("To state a claim under the [UDTPA] plaintiff must allege that defendants publicized untrue or misleading statements that disparaged goods or services."); *Indus. Specialty Chems., Inc. v. Cummins Engine Co., Inc., 902 F. Supp. 805, 812 (N.D. Ill. 1995)*. The UDTPA "does not provide a cause of action [*60] for damages, but it does permit private suits for injunctive relief." *Chi. Dist. Council of Carpenters Pension Fund v. Reinke Insulation, No. 05-3555, 2005 U.S. Dist. LEXIS 15798, 2005 WL 1838364, *8 (N.D. Ill. Aug. 2, 2005)*, aff'd, 464 F.3d 651, 659 (7th Cir. 2006)*; *see also Smith v. Prime Cable of Chi., 276 Ill. App. 3d 843, 859-60, 658 N.E.2d 1325, 1337, 213 Ill. Dec. 304 (1st Dist. 1995)*.

MPC alleges that Defendants "used words that misrepresented and disparaged, among other things, the qualities of the materials used to construct MPC's Soft Shell Tanks, MPC's processes for manufacturing such tanks, MPC's ability to manufacture such tanks, and misrepresented the Moreland Defendants' size, employees, and ability to manufacture and supply such tanks to the Air Force. (2d Am. Compl. P 53). For example, MPC claims that Defendants "falsely represented that defects in MPC's tanks were the fault of MPC" and took credit for correcting MPC's tank defects. (Def. Facts Ex. D at 2-3). In addition, MPC alleges that Defendants created confusion by: telling the Air Force that MPC stood for "Moreland Products Corporation;" giving the impression that MIL was supplying the tanks when MPC was; blurring John's employment status; falsely representing [*61] that certain copyrighted MPC drawings for the tank components were created by MIL when they were not; misrepresenting that they had authority to sell MPC tanks; and spreading a false rumor that MPC was up for sale. (*Id.;* Pl. Resp. Def. Facts PP75-75).

Because the UDTPA only allows for injunctive relief, it can only provide relief for ongoing deceptive practices. *See Alpha Delta Phi Int'l, Inc. v. Chi Delta Chi, No. 93 C. 2012, 1995 U.S. Dist. LEXIS 889, at *8-9 (N.D. Ill. Jan. 25, 1996)*; *Smith, 276 Ill. App. 3d at 859-60, 659 N.E.2d at 1337*. Here, the only potentially ongoing deceptive practice that has been identified, albeit not in MPC's response, is Defendants' use of MPC's copyrighted drawings. Therefore, any UDTPA claim with respect to Defendants' other allegedly deceptive acts is moot. *See Chi. Dist. Council of Carpenters Pension Fund, No. 05-3555, 2005 U.S. Dist. LEXIS 15798, 2005 WL 1838364, at *8*.

MPC argues that even if Defendants are no longer engaging in these deceptive practices, injunctive relief is necessary to eliminate any commercial advantage that Defendants received because they were able to develop their 200K with "negligible effort and expense." (Resp. at 44). To support this argument, MPC relies [*62] on a line of trade secrets cases which hold that injunctive relief may be appropriate "beyond the public release of trade secret information in order to prevent a wrongdoer from gaining the advantage of a head start." *Dorel Juvenile Group, Inc. v. DiMartinis, 495 F.3d 500, 504 (7th Cir. 2007)* (citing *BondPro Corp. v. Siemens Power Generation, Inc., 463 F.3d 702, 708 (7th Cir. 2006))*. However, MPC has not identified any case under the UDTPA that has permitted injunctive relief to eliminate commercial advantage. In addition, while the ITSA specifically permits an injunction to eliminate commercial advantage, the UDTPA does not. *Compare 815 ILCS 510/3* ("A person likely to be damaged by a

deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable."), *with 765 ILCS 1065/3* ("[An] injunction may be continued for an additional reasonable period of time in appropriate circumstances for reasons including, but not limited to an elimination of the commercial advantage that otherwise would be derived from the misappropriation."). We see no reason to extend injunctive relief under UDTPA to include the elimination of commercial advantage, particularly [*63] in light of the fact that the UDTPA focuses on preventing future "public deception" or confusion as to the source of goods, while ITSA addresses injuries to the trade secret owner. *See 815 ILCS 510* prefatory note; *765 ILCS 1065/3*.

Therefore, we grant summary judgment with respect to all past deceptive acts, but find that factual issues remain with respect to MPC's ongoing copyright allegations for the reasons set forth above. *See supra* Section III.

## CONCLUSION

For the reasons set forth above, we grant in part and deny in part Defendants' Motion for Summary Judgment. Specifically, we grant summary judgment on Count IV, but deny it with respect to Counts I, II, IV, and VII. Defendants' motion is also denied with respect to Counts V and VI, but their scope is limited as indicated above. It is so ordered.

/s/ Marvin E. Aspen

MARVIN E. ASPEN

United States District Judge

Date: July 23, 2008